Walter VANN, Plaintiff–Appellant,

v.

The CITY OF NEW YORK and The New York City Police Department, Defendants–Appellees,

New York City Police Officer Raul Morrison, Defendant.

No. 220, Docket 95–7155.

United States Court of Appeals, Second Circuit.

Argued Sept. 28, 1995.

Decided Dec. 19, 1995.

Jonathan C. Moore, New York City, for Plaintiff–Appellant.

Linda H. Young, New York City (Paul A. Crotty, Corporation Counsel of the City of New York, Pamela Seider Dolgow, David Lock, New York City, on the brief), for Defendants–Appellees.

Before: KEARSE, WALKER, and CALABRESI, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff Walter Vann appeals from so much of a final judgment entered in the United States District Court for the Southern District of New York, Loretta A. Preska, *Judge*, as dismissed his complaint under 42 U.S.C. § 1983 (1988) against defendants-appellees City of New York (the "City") and the New York City Police Department (the "Department") (collectively "appellees" or the "municipal defendants"), seeking redress for the use of excessive force by a City police officer who had a history of abusive conduct. The district court granted summary judgment in favor of the municipal defendants on the ground that their system for supervising policemen foreclosed as a matter of law any finding of deliberate indifference to the public's due process rights. On appeal, Vann contends that summary judgment was improper because there were genuine issues to be tried as to whether appellees' system evidenced deliberate indifference to the need to monitor policemen who had a known history of abusive conduct and were returned to active duty. We agree and vacate the judgment and remand for trial.

## I. BACKGROUND

The events giving rise to this litigation occurred on February 1, 1988, and are not at issue on this appeal. Vann, employed as a bus driver, was driving a bus in Brooklyn, New York, on his regular route. Defendant Raul Morrison was an off-duty City policeman driving his own automobile. As Morrison attempted to execute a U-turn, his car collided with Vann's bus. Morrison, who was not in uniform, got out of his car, identified himself as a police officer, drew his service revolver, and told Vann, "I should shoot you

nigger and make sure you never drive a bus." Morrison proceeded to hit Vann in the head and face several times, threw him against a wall and against the bus several times, and handcuffed him. Morrison placed Vann under arrest and took him to the police station, where the precinct commander voided the arrest. As a result of Morrison's use of force, Vann was treated at a hospital for injuries to the head, face, and body. The injuries forced Vann to miss work for some seven weeks.

Vann brought the present action against Morrison, the City, and the Police Department. He alleged principally (a) that the use of excessive force violated his right to due process, and (b) that in light of Morrison's history of abusive conduct, the Department's failure to monitor Morrison constituted deliberate indifference to the public's due process rights.

A. *Morrison's History*

Pretrial discovery made available numerous details as to Morrison's history as a police officer. Viewed in the light most favorable to Vann, the record showed that Morrison had been the subject of numerous complaints, lodged by both colleagues and civilians; that he had been disciplined several times, psychologically evaluated, and placed on restricted duty; and that he had been returned to active duty, following which he was involved in several additional incidents before assaulting Vann.

1. *July 16, 1982, to April 27, 1984*

Morrison became a police officer in January 1982. Soon thereafter the Department began receiving complaints about his conduct toward the public. They included the following:

(1) July 16, 1982: a complaint alleged that Morrison, brandishing his gun, approached a group of teenagers and stated that when he found out who had broken his car window they were going to "fall." This complaint was conciliated.

(2) August 20, 1982: a complaint alleged that Morrison, while off-duty, unjustly arrested, pushed, and kicked the com-

plainant's brother. This complaint was withdrawn.

(3) October 22, 1982: a complaint alleged that after a driver honked his horn, Morrison called the driver a "fucking Puerto Rican" and dragged him out of the car. This complaint was conciliated.

(4) January 11, 1983: a complaint alleged that Morrison went to a residence and damaged the door. After investigation, this complaint was sustained, and Morrison was subjected to command discipline.

(5) April 6, 1983: a complaint alleged that Morrison, wearing civilian clothes, grabbed an individual and pulled him from his car, calling him an idiot. This complaint was conciliated.

(6) August 2, 1983: a complaint alleged that, while attempting to get an individual to leave a beach area, Morrison cursed at him, broke his eyeglasses, and destroyed other personal property. This complaint was conciliated.

(7) August 29, 1983: a complaint alleged that Morrison drove up to a parked vehicle and told the woman inside to move her vehicle the "fuck away," calling her a "black bitch." The disposition of this complaint is not revealed in the record.

(8) November 5, 1983: a complaint alleged that Morrison called an individual a "Polack" and beat and choked him. This complaint was conciliated; Morrison was advised that his ethnic remark was improper, that his complaint record was excessive, and that further complaints would be fully investigated.

(9) November 21, 1983: a complaint alleged that Morrison threatened an individual with a nightstick, pushed him, and said that if he opened his mouth Morrison would "bust him across the face." This complaint was withdrawn.

In March 1984, in light of the numerous complaints, Morrison's then-precinct commander, Captain Anthony Lamattina, referred Morrison to the Department's Early Intervention Unit ("EIU"). One of EIU's functions was to encourage officers with personal problems to seek help before their problems affected their work performance.

EIU interviewed Morrison, who repeatedly expressed the view that he was not accorded the proper "respect." EIU concluded that Morrison had an "attitude" and that most of the civilian complaints against him stemmed from incidents that should not have occurred. Shortly after that interview, Morrison was the subject of yet another complaint. In the wake of the new complaint, whose details and resolution are not revealed in the record, Captain Lamattina referred Morrison to the Department's Psychological Services Unit ("PSU"). PSU, a unit of the Department's Health Services Division, was responsible for, *inter alia*, evaluating employees who were, or were suspected of, experiencing psychological problems; at the request of an officer's supervisor, PSU would evaluate the officer's psychological fitness for duty.

On April 6, 1984, PSU psychologist Dr. Arthur Knour commenced an interview of Morrison but suspended it because he did not have the details of the civilian complaints against Morrison. The interview was not resumed until April 30. In the meantime, on April 27, Morrison referred himself to PSU, stating in an interview with Detective Richard Kleiner and PSU psychologist Dr. Eloise Archibald that he was depressed because of a recent break-up with his girlfriend. He also stated that, "when I get aggravated, I get easily ticked off, and then I get the civilian complaints." As a result, Morrison was officially relieved of his firearms and was placed on restricted duty pending psychological evaluation.

### 2. *April 30, 1984, to May 1986*

On April 30, 1984, Knour resumed his interview of Morrison. He found Morrison to be

> a very rigid, defensive, somewhat passive-aggressive individual who had a great deal of difficulty adequately handling and expressing his feelings of anger and resentment and, as a result, his behavior could, on occasion, lead to the escalation of initially minor situations.

Morrison denied that he needed any individual therapy but agreed to "couples" counseling with his girlfriend.

Between May and July 13, 1984, Morrison, initially with his girlfriend and later individually, received counseling from Rozetta Wilmore–Schaeffer, M.S.W., a psychotherapist. In a July 13, 1984 interview with Knour, Morrison stated that he was no longer depressed and that he wanted to return to full duty. On July 20, 1984, Wilmore–Schaeffer reported that Morrison's depression had diminished and that there were "no indications that Mr. Morrison might misuse his gun or lose control of his anger and hurt someone in other ways."

Morrison was not at that time returned to full-duty status, however, because of problems in his performance on his restricted-duty assignment, which was in the Department's Health Services Division. On August 1, 1984, Knour was asked to interview Morrison again because Morrison had repeatedly been late returning to work from his meal break and was having difficulty getting along with his coworkers. These complaints led to the referral of Morrison to psychiatrist Dr. Abe Pinsky for an independent evaluation. Dr. Pinsky found no signs of psychiatric illness and recommended that Morrison be returned to full-duty status with firearms.

Knour nonetheless did not recommend a return to full-duty status because Morrison continued to have conflicts with his coworkers. During the summer of 1984, three of Morrison's supervisors at the Health Services Division informed Knour that Morrison was a source of problems, failing to do his share of the work and not getting along with others, uniformed or civilian. For example, Morrison was involved in at least one physical conflict with a police aide. Knour stated that Morrison repeatedly denied the facts presented with respect to his conflicts and confrontations and that he refused to accept any responsibility for any of the incidents, usually blaming the other individuals involved. Noting that Morrison had initially been referred to PSU because of his full-duty conflicts with civilians, Knour observed that Morrison's confrontations had continued in the context of the non-stressful restricted-duty assignment, thereby "rais[ing] questions about whether counseling had really been effective in bringing changes in this officer's

mode of interaction with others and whether he could function without undue problems as a full duty police officer."

In December 1984, Morrison received a negative psychological evaluation. He was rated substandard in impartiality, human relations, communication skills, work analysis, self-image, stability/flexibility, police ethics, decisionmaking, and judgment. His supervisor also gave him a below-standard overall evaluation, noting Morrison's several altercations with his coworkers.

In January 1985, Morrison physically assaulted a female police aide. When the aide attempted to close a window that Morrison had opened, Morrison shoved her and put his hand to her neck.

In the meantime, in November 1984, departmental charges had been brought against Morrison for lateness, failure to comply with an order, and displays of discourtesy and disrespect toward a senior officer. In December 1985, Morrison was found guilty and was docked 30 days' vacation pay, ordered to cooperate in any programs PSU recommended for him, and placed on disciplinary probation from December 22, 1985, to December 21, 1986. The ruling also stated that any further violation of rules and regulations would entitle the Department to order Morrison's dismissal.

In February 1986, following approximately a year without any incident of which Knour was aware, Knour recommended that Morrison be restored to full-duty status with firearms. Knour noted that in 1985, Morrison had received positive evaluations from three supervisors. One stated that, "after being the subject of disciplinary proceedings, disposition of which is pending, [Morrison] has done an about face and now is performing a vital role for this command. He deals with fellow officers in a manner that is without incident. His sick record for this year is exceptional and [he] appears motivated to advance in this department." Knour expressed surprise at the favorable evaluations in light of Morrison's earlier attitude and behavior, but he concluded that Morrison apparently had changed "as a result of administrative sanctions." Knour concluded that, although "Morrison has always been

somewhat rigid, and it is possible that back on the street his rigidity might reassert itself, ... he deserves a chance...." Knour ended his February 1986 report by noting that Morrison was still on probation and stating that "should new problems surface he could be administratively terminated."

In March 1986, Dr. Archibald, who was by then the Director of PSU, endorsed Knour's recommendation that Morrison be restored to full-duty status with firearms. Archibald also "[c]oncur[red] with Dr. Knour's recommendation ... that future problems be handled administratively." After making her recommendation, Archibald sought the opinion of then-precinct commander Captain Arthur C. Woods. Captain Woods, based on conversations with Morrison's direct supervisors and on the "numerous civilian and supervisory complaints," recommended that Morrison not be restored to full-duty status. Woods stated that Morrison was "not well able to deal with the general public or his supervisors" and that he was "immature" and "violent-prone."

### 3. May 1986 to February 1988

Notwithstanding Woods's recommendation, Morrison's firearms were returned to him on May 28, 1986, and he was reinstated to full-duty status on June 6, 1986. He was assigned a patrol function, which placed him in direct contact with the public.

Less than two months later, on August 3, 1986, a civilian complaint was filed with the Civilian Complaint Review Board ("CCRB"), alleging that Morrison had unnecessarily used force, injuring a civilian by ramming him in the stomach with a nightstick. The complaint was eventually withdrawn.

One week later, another civilian complaint was filed with the CCRB, alleging that Morrison had verbally abused, and unnecessarily threatened, the complainant, saying that he was going to "beat the shit out" of him. The complaint was conciliated.

Morrison's disciplinary probation ended in December 1986. On April 13, 1987, he was the subject of another civilian complaint filed with the CCRB. The complaint alleged that, while off duty and driving a vehicle, Morrison

had become involved in an altercation with another driver and the driver's wife, during which Morrison assaulted, menaced, and pointed his gun at the complainant. In the wake of this complaint, Morrison was placed on modified assignment and prohibited from carrying firearms. On August 17, 1987, he was returned to full-duty status with firearms, an investigation having resulted in the conclusion that the complaint was unsubstantiated.

On February 1, 1988, Morrison assaulted Vann.

### B. *The Police Department's Supervisory System*

The municipal defendants moved for summary judgment dismissing Vann's claims against them, pointing in some detail to the operations of the Department's "supervisory units" that dealt with problem officers, including PSU; EIU; the Department Advocate's Office ("DAO"), which until February 1988 had primary responsibility for monitoring police officers who were on disciplinary probation; and the Central Personnel Index ("CPI"), which collected data on police officers that might suggest performance problems and issued warnings to EIU. Appellees contended principally that, together, its "divisions form a comprehensive system for monitoring the performance of Police Officers," and that therefore the Department could not be found to have been deliberately indifferent to police misconduct. They further maintained that their treatment of the three civilian complaints lodged against Morrison after he was reinstated to full-duty status in 1986 was not evidence of deliberate indifference to the risk Morrison presented to the public because none of the complaints ultimately was "substantiated." Appellees argued that "[t]he mere occurrence of complaints that are not substantiated, without more, is insufficient to establish a policy of deliberate indifference." (Defendants' Memorandum of Law in Support of Motion for Summary Judgment, at 18.)

In opposition to summary judgment, Vann admitted the existence of the Department's supervisory units, and he admitted that the Department had taken appropriate steps to supervise Morrison until his reinstatement to full-duty status in 1986. Vann contended, however, that the Department's failure to monitor Morrison after his reinstatement to full-duty status was pursuant to a policy of deliberate indifference because, with respect to police officers who had a known history of abusive conduct and had been reinstated to full duty, none of the units on whose existence appellees relied made any meaningful effort to take heed of new civilian complaints filed against those officers.

In support of his contentions, Vann relied in part on deposition testimony by Dr. Archibald that the Department deemed a civilian complaint "unsubstantiated" whenever there was no neutral witness who could verify the version of either the officer or the civilian, and it was the word of the police officer against that of the civilian(s). (Deposition of Dr. Eloise Archibald ("Archibald Dep.") at 104.) Archibald acknowledged, however, that the very fact that an unusual number of civilian complaints had been filed, without regard to how they were ultimately resolved, could create concern that the officer was experiencing psychological problems and was suffering from stress that caused him to escalate minor situations into major confrontations (*id.* at 47, 122).

Vann also cited deposition testimony from individuals who had worked with EIU, CPI, DAO, or PSU, to the effect that the Department routinely failed to inform its supervisory units of the filing of civilian complaints against officers who had a history of abusive conduct. None of these units, except PSU, attached any significance to the filing of such complaints; and PSU did not advise those who knew of the complaints to pass the information on to the supervisory units.

For example, Sergeant Andrew Foppiano was an investigator and then the investigating supervisor in DAO which, until February 1988, had responsibility for monitoring officers who were on disciplinary probation. He testified that in February 1988, DAO was monitoring some 200 officers on probation; the monitoring function was carried out by the equivalent of 1.25 DAO employees. In performing that function, DAO investigating personnel would receive notice of an officer's

being placed on disciplinary probation and would send the officer's commander or integrity-control officer a packet of one-page forms for the officer. One form was to be filled out and returned to DAO every two months. Upon receipt of the completed form, DAO would make note of whether the officer had received any disciplinary or otherwise negative evaluations. However, commanding officers were not instructed to, and normally did not, report the filing of new civilian complaints. Nor did DAO seek or receive such information from CPI or the CCRB. Foppiano testified that DAO was not concerned about the fact that a new civilian complaint had been filed against a DAO-monitored officer unless and until the officer was found guilty.

Lieutenant Alfonse Pirozzi, an EIU investigator from 1985 to early 1988, testified similarly that there was no system by which the CCRB would regularly report civilian complaints to EIU. In February 1988, Pirozzi, who had received no psychological or psychiatric training, transferred to the Performance Analysis Unit ("PAU") of the Department's Employee Management Division, which then took over from DAO the job of monitoring officers on disciplinary probation. PAU did not expand the scope of the monitoring function as DAO had carried it out.

Although copies of civilian complaints were received by the accused officers' commanding officers, Dr. Archibald testified that a commander's decision as to whether to take any administrative or other responsive action to unsubstantiated complaints was discretionary. She testified that there was some hesitancy on the part of commanders to refer problem officers to divisions such as PSU, because the commanders were "afraid that in referring the officer, the officer may be unhappy about being referred. In fact, more than just unhappy. Maybe very angry about it, maybe even wanting to … start some legal action against them…." (Archibald Dep. at 109.) Further, though the fact that a number of civilian complaints had been filed could well be an indication of psychological problems (Archibald Dep. at 47), Dr. Archibald testified that when she gave commanding officers guidance as to what kind of factors to look for in making referrals to PSU, she "typically" did not mention civilian complaints (Archibald Dep. at 112).

After his reinstatement, Morrison was not monitored by PSU, and the filing of the three new civilian complaints against him was not communicated to PSU. With respect to the first two complaints—filed while Morrison was still on disciplinary probation—Morrison's commanding officer did not refer him to any of the Department's supervisory units or initiate any other type of administrative response to lessen the risk that Morrison would engage in future misconduct. In response to the third complaint, the commander restricted Morrison's assignment and relieved him of his firearms; but Morrison was reinstated to full-duty status with firearms when the complaint was deemed unsubstantiated. The commander did not refer Morrison to PSU for evaluation. The officials in the supervisory units, if they knew of the complaints, elected to take no action whatever.

Vann also submitted an affidavit from Dr. Guy Seymour, Chief Psychologist for Atlanta, Georgia, and the Atlanta Police Department, who had been a consultant for many municipal police departments in a number of states. Dr. Seymour concurred with PSU's 1984 conclusions as to Morrison's personality disorder and with its suggestion that future misbehavior be dealt with by administrative dismissal. In Dr. Seymour's view, the post-reinstatement complaints filed against Morrison indicated that Morrison was following his established tendency to escalate mild altercations into verbal confrontations and ultimately to resort to force; the filing of those complaints should have prompted Morrison's dismissal, his reassignment to restricted duty, or, at the very least, his referral to PSU. The Department's failure to take any action was unreasonable, especially since the first two incidents occurred soon after Morrison's reinstatement to full-duty status and while he was still on disciplinary probation. (Affidavit of Dr. Guy Seymour dated February 20, 1993 ("Seymour Aff."), ¶¶ 5–8, 10–11, 14.) Given his continued inappropriate behavior, Morrison "put[ ] the public at risk simply by his continued employment as a police officer." (Seymour Aff. ¶ 15.)

Dr. Seymour stated that, particularly in view of the postreinstatement complaints, it

was foreseeable that Morrison would continue to engage in misconduct, and some mechanism should have been put into place to forestall that result:

6. The failure to implement meaningful and effective oversight procedures is reflected in the fact that not two months after defendant Morrison's restoration of firearms and removal from restricted duty occurred, *but while he was still on disciplinary probation,* Morrison was the subject of two civilian complaints in August, 1986: one for excessive force and one for the threat to use force inappropriately.

7. .... These complaints are similar to those that had been made against defendant Morrison over the years of his tenure in the police department, and were similar to the types of confrontations that defendant Morrison, as documented in the defendant City of New York's records, had admitted was a problem for him in the past. This pattern of complaints is typified by Morrison's tendency to escalate a mild altercation to a verbal confrontation and ultimately to resort to force to exert his point of view in the situation. Administrative action should have been taken, or at least contemplated, and the PSU should have at least been contacted for an assessment of the meaning of this type of repetition of inappropriate behavior....

8. Events in April, 1987, should also have triggered, but did not, a review of defendant Morrison's behavior and/or some kind of administrative action by the Department. In April, 1987, defendant Morrison was the subject of a force complaint of almost the exact kind that occurred with the plaintiff in this case, and which also had striking similarities to prior complaints against Morrison. Clearly this should have, but did not, trigger a referral to PSU, or some other administrative oversight or action to protect the public from the type of foreseeable behavior Morrison had demonstrated a propensity to engage in since his appointment to the police department.

(Seymour Aff. ¶¶ 6–8 (emphasis in original).)

12. At the very least, the incident of April, 1987, which so classically recapitulated the behavior and disordered conduct which had gotten Officer Morrison into trouble before, should have triggered a review by a number of individuals including the Early Intervention program, and PSU. All evidence I have reviewed point [*sic*] to the fact that it was painfully well known at least by that time that Officer Morrison's behavior was only going to be kept in check and within appropriate bounds by the imposition of disciplinary action.

13. The defendant City of New York has asserted in its papers in support of their motion for summary judgment that the plaintiff has "adduced no evidence suggesting any systemic failure on the part of the City of [*sic*] monitor officers' conduct or to discipline them for misconduct.".... The evidence that I have reviewed in this case, including but not limited to the personnel files on defendant Morrison and the depositions of Dr. Archibald, Sgt. Andrew Foppiano and Lt. Alfonse Pirozzi, supports just the opposite conclusion. The evidence ... suggests that the defendant City of New York's monitoring system is woefully inadequate to monitor and supervise officers with the kind of behavioral history like Morrison. For example, any system that allocates 1.25 persons to monitor 200 officers on disciplinary probation ... is no system at all. Any system where the monitors perform only "clerical functions" is no system at all.... This evidence strongly supports the conclusion that the system of monitoring officers like Morrison is, in fact, not a system at all.

(Seymour Aff. ¶ 12–13.) Dr. Seymour concluded:

The failure to effectively monitor and oversight an officer on disciplinary probation who is the subject of two civilian complaints of a kind similar to conduct that had been deemed problematic in his past by the Department is more than just an aberration. This failure is a systemic failure which amounts in my judgment to callous indifference on the part of the defendant City of New York to the constitutional rights of the citizens of this City.

(*Id.* ¶ 7.)

### C. The District Court's Decision

In an Opinion and Order dated September 30, 1993 ("District Court Opinion"), the dis-

trict court granted the municipal defendants' motion for summary judgment dismissing the claims against them on the ground that the existence of a departmental system for supervising policemen established as a matter of law that appellees had not been deliberately indifferent to the rights of individuals. The court found, first, that the proper focus was solely on Morrison's record after mid–1986:

> It is plaintiff's position that the City took the appropriate steps to evaluate and counsel Morrison prior to June 1986.... However, plaintiff argues that after June 1986 the City deliberately disregarded the risk Morrison posed to the public "by failing to effectively monitor, review and take any administrative action with regard to Officer Morrison.".... Therefore, it is only the post–1986 [*sic*] events which plaintiff relies on to make a case of deliberate indifference.

District Court Opinion at 6. The court apparently found the three civilian complaints filed against Morrison after June 1986 to be irrelevant because they did not result in findings of guilt:

> Plaintiff argues that the filing of the three post–1986 [*sic*] complaints should have triggered administrative action by the City and/or the intervention of the PSU.... However, the three civilian complaints relied on by plaintiff "do not raise any issue of fact as to the liability of the City of New York for any claimed deprivation of plaintiff's constitutional rights", because one of the claims was withdrawn, one conciliated and one was dismissed as unsubstantiated. *Law v. Cullen*, 613 F.Supp. 259, 262 (S.D.N.Y.1985).

District Court Opinion at 7–8. The court concluded that

> [t]he City has submitted detailed testimony outlining the operation of the police department's monitoring services and the methods for referring an officer for supervision or counseling.... The existence of City programs such as the Police Department's Central Personnel Index, Early Intervention Unit and the PSU demonstrate that as a matter of law the City has not been deliberately indifferent to the rights

of its citizens. *See e.g., Sarus v. Rotundo*, 831 F.2d 397 [ (2d Cir.1987) ]. "In the face of the [deposition testimony] of persons with the responsibility for training and supervision of police officers as to the City's policies and procedures for detecting and avoiding abuse or use of excessive force ..." it is the finding of the Court that plaintiff has failed to raise a material issue of fact concerning the municipal liability of the City. *Law v. Cullen*, 613 F.Supp. at 263.

District Court Opinion at 8–9. Accordingly, Vann's claims against the Department and the City were summarily dismissed. His subsequent motion for reconsideration was granted, but the court adhered to its decision.

The court later dismissed the claims against Morrison because he had been adjudged a bankrupt and Vann's claims against him had been discharged. A final judgment was entered, and this appeal, challenging only the dismissal of the claims against the municipal defendants, followed.

## II. DISCUSSION

On appeal, Vann contends that the district court erred in ruling that as a matter of law the municipal defendants could not be found to have been deliberately indifferent to constitutional violations by problem police officers following their reinstatement. We agree that summary judgment was inappropriate.

A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In ruling on such a motion, the district court is to view the evidence in the light most favorable to the party opposing the motion, drawing all permissible

inferences from the submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam). If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *See, e.g., Brady v. Town of Colchester*, 863 F.2d 205, 210–11 (2d Cir.1988).

The role of the court on a motion for summary judgment is not to try issues of fact but only to determine whether there are issues of fact to be tried. *See, e.g., Anderson v. Liberty Lobby Inc.*, 477 U.S. at 255, 106 S.Ct. at 2513; *Gallo v. Prudential Residential Services, Limited Partnership*, 22 F.3d 1219, 1223–24 (2d Cir.1994); *Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 58 (2d Cir.1987). The drawing of inferences and the assessment of the credibility of the witnesses remain within the province of the finders of fact. In reviewing an appellate challenge to the granting of summary judgment, we are governed by the same principles. We review the record *de novo*, and we view the evidence in the light most favorable to the party opposing summary judgment. *See, e.g., Healy v. Rich Products Corp.*, 981 F.2d 68, 72 (2d Cir.1992); *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

 In order to establish the liability of a municipality in an action under § 1983 for unconstitutional acts by a municipal employee below the policymaking level, a plaintiff must establish that the violation of his constitutional rights resulted from a municipal custom or policy. *See, e.g., Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989); *Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) (plurality opinion); *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978); *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 43 (2d Cir.1985),

*cert. denied*, 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 685 (1987); *Walker v. City of New York*, 974 F.2d 293, 296–98 (2d Cir.1992), *cert. denied*, 507 U.S. 972, 113 S.Ct. 1412, 122 L.Ed.2d 784 (1993); *Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119, 122–23 (2d Cir. 1991). This does not mean that the plaintiff must show that the municipality had an explicitly stated rule or regulation. *See, e.g., Villante v. Department of Corrections*, 786 F.2d 516, 519 (2d Cir.1986). A § 1983 plaintiff injured by a police officer may establish the pertinent custom or policy by showing that the municipality, alerted to the possible use of excessive force by its police officers, exhibited deliberate indifference. *See, e.g., Fiacco v. City of Rensselaer*, 783 F.2d 319 (2d Cir.1986), *cert. denied*, 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987); *see id.* at 326–27 (municipality "should not take a laissez-faire attitude toward the violation by its peace officers of the very rights they are supposed to prevent others from violating").

 To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious. *See Canton v. Harris*, 489 U.S. at 390, 109 S.Ct. at 1205. An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents. *See, e.g., Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d at 123; *Fiacco v. City of Rensselaer*, 783 F.2d at 328 ("[w]hether or not the claims had validity, the very assertion of a number of such claims put the City on notice that there was a possibility that its police officers had used excessive force"). Deliberate indifference may also be shown through expert testimony that a practice condoned by the defendant municipality was "contrary to the practice of most police departments" and was "particularly dangerous" because it presented an unusually high risk that constitutional rights would be violated. *See Dodd v. City of Norwich*, 827 F.2d 1, 4–6 (2d Cir.), *modified on reh'g on other grounds*, 827 F.2d

1, 7 (2d Cir.1987), *cert. denied,* 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 653 (1988); *see also Oklahoma City v. Tuttle,* 471 U.S. at 823–24, 105 S.Ct. at 2436; *Sarus v. Rotundo,* 831 F.2d 397, 401–02 & n. 3 (2d Cir.1987).

Appellees argue that, under *Sarus v. Rotundo,* a municipality that has adopted supervisory mechanisms for dealing with problem officers cannot be found to be deliberately indifferent to police misconduct in violation of constitutional rights. Their reliance on *Sarus* for that proposition is misplaced, for the verdict in favor of the plaintiffs in that case was reversed simply for lack of proof, as "the only relevant evidence presented by [plaintiffs] was the manner in which they themselves were arrested." *Id.* at 402. *See generally Oklahoma City v. Tuttle,* 471 U.S. at 823–24, 105 S.Ct. at 2436 (single incident involving employee below the policymaking level generally will not suffice to support inference of a municipal custom or policy). The plaintiffs in *Sarus* presented no evidence as to the municipality's response to any prior incident of misconduct, no evidence that superior methods were in use in other police departments, and no expert testimony as to proper police procedures. We concluded that the plaintiffs had shown "no basis for a jury to conclude that [the municipality's] system was lacking in any way, let alone so deficient as to reflect a policy of deliberate indifference to the civil rights of the citizenry." 831 F.2d at 401–02. The record in *Sarus* was a far cry from that here.

In the present case, Vann presented evidence of the Department's general methods of dealing with problem policemen and of its responses to past incidents involving Morrison. Taken in the light most favorable to Vann, the evidence of the Department's system for dealing with problem officers in the earlier stages of their difficulties highlights the paucity of its monitoring system after such officers were reinstated. The deposition testimony indicated that, after a problem officer was restored to full-duty status, the Department's supervisory units paid virtually no attention to the filing of new complaints against such officers even though such filings should have been red-flag warnings of possibly renewed and future misconduct. DAO, which monitored officers who were on disciplinary probation, was typically not informed by CPI, by precinct commanders, or by the CCRB as to the filing of civilian complaints. In any event, DAO, woefully understaffed for any significant monitoring function, was not concerned that officers they monitored were the subject of new civilian complaints. And the director of PSU, who acknowledged that the receipt of new complaints was significant for the evaluation of the likelihood that the problem officer would engage in future wrongful conduct, also testified that she "typically" did not tell the commanders to alert DAO or PSU to the receipt of such complaints.

With respect to Morrison in particular, PSU psychologists had early noted Morrison's personality disorder; they had noted thereafter that he did not respond productively to counseling and that he altered his attitude and behavior only in response to administrative discipline; they foresaw that if restored to full duty his problems might recur; and they suggested that if he engaged in further misconduct, he should be dismissed. Yet even while Morrison was on disciplinary probation, there was no mechanism for ensuring that DAO or PSU was alerted that within two months of his restoration to full-duty service the Department had begun to receive new complaints of his physical abuse of civilians. We note that appellees' contention that the Department's treatment of the three postreinstatement complaints against Morrison did not bespeak indifference because the complaints were "unsubstantiated" is a matter for argument to the jury, given the Department's apparent inclusion of conciliated complaints in that category and the fact that at least one of the earlier conciliated complaints against Morrison resulted in his being disciplined.

Dr. Seymour's expert view was that the three postreinstatement complaints indicated that Morrison was acting in accordance with his established, and departmentally well known, tendency to escalate confrontations, inappropriately, to the point where he used force. In light of the Department's "systemic failure" to alert the supervisory units of

the filing of new complaints against problem officers, and in the absence of any significant administrative response to Morrison's resumption of his abusive misconduct upon reinstatement, it was entirely foreseeable that Morrison would engage in misconduct yet again.

In sum, a rational jury could find that, where an officer had been identified by the police department as a "violent-prone" individual who had a personality disorder manifested by frequent quick-tempered demands for "respect," escalating into physical confrontations for which he always disavowed responsibility, the need to be alert for new civilian complaints filed after his reinstatement to full-duty status was obvious. The jury could also rationally find that the Department's election to staff DAO with the equivalent of just 1¼ employees to monitor 200 problem officers, together with the systematic lack of communication to the supervisory divisions of information with regard to new civilian complaints, including PSU's routine failure, despite its expertise, to instruct commanders to relay that information reflected a deliberate indifference on the part of the municipal defendants to the dangers posed by problem policemen who had been restored to full-duty service.

Finally, we note that appellees also argue that even if there was deliberate indifference tantamount to a custom or policy, it did not cause Vann's injuries because Morrison was off duty when that assault occurred. The issue of causation remains to be decided by the jury. Certainly the Department's retention of Morrison as a police officer despite his abusive history empowered him to make arrests even while off duty. And it would be entirely permissible for the jury to find that the Department's restoration of Morrison to full-duty status and its indifference to the postreinstatement civilian complaints against him caused him to feel entitled, whether on duty or off, to compel the "respect" he demanded through the use of violence. In any event, the district court did not decide the causation issue and, on the record before us, we cannot conclude that the Department's actions did not cause Vann's injuries.

We conclude that the district court's grant of summary judgment, dismissing the claims against the municipal defendants as a matter of law, was inappropriate.

## CONCLUSION

We have considered all of the municipal defendants' arguments in support of the judgment in their favor and have found them to be without merit. For the foregoing reasons, the judgment of the district court is vacated and the case is remanded.

Costs to plaintiff.