Richard J. BRENNAN, Plaintiff,

v.

BAUSCH & LOMB, INC. and
Pharmafair, Inc.,
Defendants.

CV 94–3712 (ADS).

United States District Court,
E.D. New York.

Jan. 23, 1997.

John J. Leo, New York City, for Plaintiff.

Bond, Schoeneck & King, LLP, Syracuse, (Raymond J. Pascucci, of counsel), for Defendants.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge:

This employment discrimination lawsuit arises from the claims of the plaintiff, Richard J. Brennan ("Brennan" or the "plaintiff"), that he was unlawfully discharged by the defendants Bausch & Lomb, Inc. ("B & L") and Pharmafair, Inc. ("Pharmafair," collectively the "defendants" or the "Company") based on his age, disability and gender in

violation of the Age Discrimination in Employment Act, ("ADEA") 29 U.S.C. §§ 621 et seq., Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., and Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e et seq. Originally, the Complaint also alleged several state law causes of action. These claims however, were withdrawn by stipulation dated August 6, 1996.

Presently before the Court is the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 arguing that Brennan has failed to produce any evidence that their legitimate non-discriminatory reasons for the plaintiff's discharge were a pretext for unlawful discrimination. The plaintiff opposes the motion arguing that he has set forth sufficient evidence of pretext to create material issues of triable fact and defeat the defendants' motion.

## I. *Background*

The plaintiff is a resident of Suffolk County. From 1968 through 1971, he served in the Army. According to the Complaint, he has a "military service-connected epilepsy/seizure disorder, a service-connected broken back, and service-connected gastric ulcer condition." Compl. ¶ 9. At all times relevant to this litigation he was over 40 years old.

The defendants are New York corporations, B & L with its principal place of business in Syracuse, New York and Pharmafair with its principal place of business in Hauppauge, New York. Pharmafair is subsidiary of B & L. The Company is a manufacturer of, among other things, pharmaceutical products.

The plaintiff was originally hired on May 1, 1990 at age 43, through an employment agency as a leased employee, to work at the Company's Hauppauge plant as a Human Resources Manager. At that time, the operations in the Hauppauge facility were winding down and being transferred to the Company's new plant in Tampa, Florida. Brennan was hired by Timothy Irvin, Vice President of Human Resources in order to facilitate the closing. According to the defendants, at the time of hire, they knew that

Brennan was disabled. In November 1990, the plaintiff was hired as a Company employee with the projected closing of the Hauppauge plant in six to eight months. Brennan concedes that when he was hired, he knew that the Hauppauge facility would close, but claims that he was advised that upon closing, he would be transferred to the Tampa facility.

In any event, in July 1991 he was laid off and replaced by Elissa Tommasi. According the defendants' moving papers, which the plaintiff does not dispute, Tomassi was Brennan's predecessor as Human Resources Manager. She was transferred to Tampa to accommodate her husband's medical problems. In July 1991, Tommasi returned to Hauppauge after her husband died and she was given her old job, thereby displacing Brennan. At that time, the plaintiff was 44 years old and Tommasi was 40.

In November 1991, the closing date for the Hauppauge facility was again postponed, this time to mid 1992, and Tommasi left the Human Resources Manager position, creating a vacancy. Irvin, along with Ted Borgel, the new Plant Manager, contacted Brennan to rehire him. They did so knowing of the plaintiff's age, and that he had certain medical needs.

According to the plaintiff however, he was contemplating filing discrimination charges at this time pursuant to his initial layoff. He was advised that he would be rehired if he did not commence any proceedings.

In March 1992, the Food and Drug Administration ("FDA") placed severe restrictions on drug manufacturing approvals thereby limiting the Company's ability to close the Hauppauge facility. Consequently, the target closing date was moved back from several months to several years. According to the defendants, Irvin and Borgel then decided they would need a more experienced Human Resources Manager "to manage what would be a more stable, long-term Human Resources function."

In February 1992, B & L's International Division ("ID") headquarters was being eliminated. As a result, the ID's staff was looking for reassignments. Among these

employees was Elaine Lakis, who was associated with the ID's human resources organization since 1984. Lakis was ultimately hired to replace Brennan in September 1992. At that time, the plaintiff was 45 years old and Lakis was 40. According to the defendants, Lakis was hired because she was a "more experienced Human Resource professional who was a long-term [B & L] employee ... who was being displaced ... due to corporate reorganization." The Hauppuage Plant was closed in 1994 and Lakis was terminated. She was then retained on a temporary basis to assist with the open cases in Hauppauge.

According to Brennan however, the reasons alleged by the defendants for his discharge are nothing more than a pretext for unlawful discrimination. In support of his position he claims that he had been given a number of conflicting reasons for his discharge. For example, Brennan asserts that he was advised by Borgel, that Lakis would replace him for fear of "EEOC problems and trouble." To further bolster this argument, Brennan claims that a job posting notice for Lakis's former position was listed shortly after she began working at Pharmafair. The defendants dispute this contention, maintaining that this listing was for a different position.

In a letter dated September 25, 1992, Lakis states that the plaintiff was laid off as the result of "staff considerations" related to the "impending relocation." Brennan Aff. ¶ 28, Exh. N-a. Yet, Pharmafair advised the New York State Department of Labor, that the plaintiff was being terminated based on "lack of work." Id. Exh. O. After discrimination charges were filed with the New York State Division of Human Rights, the Company took a third position, namely that the plaintiff was a temporary employee. Id. Exh. Q. The defendants contest Brennan's interpretation of these reasons, arguing that they are all consistent with the plant closing.

Further, Brennan claims that during discovery, the Company modified its position again, maintaining that it was attempting to recruit "good," "junior" people who would further their career with on-the-job training. Id. Exh. R. Nevertheless, alleges Brennan,

in direct contradiction to this position he was advised that he was being discharged because of his insufficient experience in plant management. Id. Exh. S. Despite this, he stayed on for two weeks to help train Lakis.

In addition, the plaintiff alleges that during the course of his employment with the defendants, his superiors would insult him because of his disability. In his deposition, the plaintiff testified as follows:

A: On several occasions Mr. Irvin made fun of the fact that I have a seizure disorder and asked me if that was in any way shape or form affecting the function of my brain because he didn't think I was making a very good decision on one thing or another.

On more than one occasion that was done.

Q: When was the first time that was done?

A: The first occasion was probably, if I recall correctly, it was during my first period of employment there before I was laid off with Elissa Tommasi coming back to New York.

Tim has a very favorite phrase, he calls it "no brainer," and he would apply the "no brainer" thing to me on if not a regular basis, an occasional basis, was my brain not functioning right, was it the army thing that you have there, ha, ha, he would laugh, is that affecting your way of thinking on this project or whatever? No, it was not.

Q: What does the phrase "no brainer" mean?

A: To me it means something that requires very little or no thought whatsoever, as a sort of mechanical response necessary to accomplish whatever the task is.

Q: So that term is not meant to describe your particular mentality, its just a general term?

A: That's the general term, yes.

Q: For easily understood matters, correct?

A: That's correct. Followed, though, by his comment upon my brain function. I find that a direct connection.

\* \* \* \* \* \*

He said, "I don't know what's going on with your brain, is it that thing you have from the army that's affecting your thoughts on this one?"
He made several references to it.

\* \* \* \* \* \*

Q: Do you have any specific recollection of the exact words he used?

A: Specific recollection? Yes. Again it was "that army thing, that thing you have from the army. Is that what's making your brain malfunction? This is really a no-brainer. Is that affecting your brain."

*Id.* Exh. Y, Deposition of Richard J. Brennan, at 111–15.

## II. *Discussion*

### A. *Summary judgment standard*

A court may grant summary judgment only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact, *Samuels v. Mockry,* 77 F.3d 34, 35 (2d Cir. 1996), and the movant is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Court must, however, resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion. *See Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995); *Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568 (2d Cir.1990); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

According to the Second Circuit "[s]ummary judgment is a tool to winnow out from the trial calendar those cases whose facts predestine them to result in a directed verdict." *United National Ins. Co. v. The Tunnel, Inc.,* 988 F.2d 351, 355 (2d Cir.1993). Once a party moves for summary judgment, in order to avoid the granting of the motion, the non-movant must come forward with specific facts showing that a genuine issue for trial exists. *West–Fair Elec. Contractors v. Aetna Cas. & Surety Co.,* 78 F.3d 61, 63 (2d Cir.1996); *see also Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir. 1990) (quoting Fed.R.Civ.P. 56(e)). A genuine issue of material fact exists if "a reasonable jury could return a verdict for the non-moving party." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510; *see Vann v. New York City,* 72 F.3d 1040 (2d Cir.1995).

However, mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment. *Kulak v. City of New York,* 88 F.3d 63, 70 (2d Cir. 1996). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 128 (2d Cir.1996); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). Finally, the Court is charged with the function of "issue finding", not "issue resolution." *Gallo v. Prudential Residential Servs., Ltd Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994).

It is within this framework that the Court addresses the grounds for the present motion for summary judgment.

### B. *The defendants' motion*

The defendants move for summary judgment arguing that the plaintiff is unable to establish any of his claims for unlawful employment discrimination as a matter of law. In the absence of substantial direct evidence, allegations of employment discrimination are governed by the three step burden shifting test as set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); and *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). As the Second Circuit recently restated the test in *Quaratino:*

First, the plaintiff has the initial burden of proving by a preponderance of the evidence a *prima facie* case of discrimination under Title VII by showing that: (1) [ ]he

is a member of a protected class; (2) [ ]he satisfactorily performed the duties required by the position; (3) [ ]he was discharged; and (4) h[is] position has remained open and was ultimately filled by non-[protected] employee. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824 . . . , *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94. . . . Alternatively, a plaintiff may satisfy the fourth requirement to make out a *prima facie* case by showing that the discharge occurred in circumstances giving rise to an inference of discrimination. *See McDonnell Douglas,* 411 U.S. at 802, n. 13, 93 S.Ct. at 1824, n. 13 . . . ; *Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 104 (2d Cir.1989).

Second, assuming the plaintiff demonstrates a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, clear, specific and non-discriminatory reason for discharging the employee. *See Gallo,* 22 F.3d at 1226. Third, if the defendant satisfies this burden of production, the plaintiff has the ultimate burden to prove that the employer's reason was merely a pretext for [unlawful] discrimination. An employer's reason for termination cannot be proven to be a pretext for discrimination unless it is shown to be false *and* that discrimination was the real reason. *Hicks,* 509 U.S. at 515–17, 113 S.Ct. at 2752.

*Quaratino,* 71 F.3d at 64.

This three step burden shifting analysis applies to discrimination claims brought pursuant to ADEA, *see Gallo,* 22 F.3d at 1224–25, and the ADA, *see Estwick v. U.S. Air Shuttle,* 950 F.Supp. 493, —— (E.D.N.Y. 1996), citing, *Newman v. GHS Osteopathic, Inc.,* 60 F.3d 153, 157–58 (3d Cir.1995); *Heilweil v. Mount·Sinai Hosp.,* 32 F.3d 718, 721–22 (2d Cir.1994) (applying burden shifting analysis in disability discrimination case brought pursuant to Rehabilitation Act).

In reverse discrimination cases however, such as the plaintiff's sex discrimination claim, some courts have applied somewhat modified version of the *McDonnell Douglas* burden shifting standard. *See Olenick v.* *New York Telephone/A NYNEX Co.,* 881 F.Supp. 113 (S.D.N.Y.1995) (adopting the standard adopted by the D.C. Circuit in *Parker v. Baltimore & Ohio R.R. Co.,* 652 F.2d 1012 (D.C.Cir.1981)). In *Parker,* the court reasoned that a plaintiff alleging a claims for reverse discrimination may rely on the *McDonnell Douglas* criteria to establish a prima facie case " 'when background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority.' " *Parker,* 652 F.2d at 1017; *Olenick,* 881 F.Supp. at 114; *see also Notari v. Denver Water Dep't,* 971 F.2d 585, 589 (10th Cir.1992) (recognizing this modified standard); *Murray v. Thistledown Racing Club, Inc.,* 770 F.2d 63, 67 (6th Cir.1985). According to the D.C. Circuit:

> [m]embership in a socially disfavored group was the assumption on which the entire *McDonnell Douglas* analysis was predicated, for only in that context can it be stated as a general rule that the "light of common experience" would lead a factfinder to infer discriminatory motive from the unexplained hiring of an outsider rather than a group member. [Majority members] are also a protected group under Title VII, but it defies common sense to suggest that the promotion of a [minority] employee justifies an inference of prejudice against [majority] co-workers in our present society.

*Parker,* 652 F.2d at 1017.

 Applying these standards, our analysis begins with a determination as to whether the plaintiff has established a prima facie case. As stated above, to demonstrate a prima facie case for each of his claims, Brennan must show that: (1) he is a member of a protected class; (2) he satisfactorily performed the duties required by the position; (3) he was discharged; and (4) his position has remained open and was ultimately filled by non-protected employee. *See, e.g., Quaratino,* 71 F.3d at 64 (setting forth these standards in the sex discrimination context). The plaintiff is disabled male over forty, which places him in protected classes under ADEA and the ADA, and renders his reverse discrimination claim possible. The Company assumes that he was qualified for the Human

Resources Manager position for the limited purpose of its summary judgment motion. In 1992, he was terminated and subsequently replaced by a younger non-disabled female each time he was laid off. Accordingly he has established a prima facie case for each of his claims.

The burden then shifts to the defendants to set forth a legitimate non-discriminatory reason for the plaintiff's discharge. *Id.* According to the Company, "[t]he material facts establishing [the] legitimate reasons for laying off Brennan are undisputed." The plaintiff was originally hired in May 1990 as a leased employee on a temporary basis in anticipation of the imminent closure of the Hauppauge facility. Brennan was hired to replace Tommasi who was moving to the new plant in Tampa to accommodate her husband's illness. By November 1990 it had become apparent that the closing of the Hauppauge Plant would not occur for six to eight months. As a result, Brennan was hired as a Company employee. In July 1991, the plaintiff was laid off when Tommasi returned from Florida after her husband's death.

In November 1991, Tommasi left the Company and Brennan was rehired. By this time, the anticipated plant closure had been pushed back to early or mid 1992. However, in 1992, new FDA restrictions on new drug manufacturing approvals for the Tampa facility led the defendants to believe that the Hauppauge closing would be delayed for several more years. As a result of this last postponement "both Borgel and Irvin decided that the Human Resources Manager at the Hauppauge plant should no longer assume merely a short-term caretaker role, but should assume a more long-term responsibility for building worker morale and conducting employee training programs." Accordingly, the defendants initiated a search for a "more experienced" individual who "could better handle a more stable, long-term Human Resources function."

At this time, Elaine Lakis, who had been employed by the Company's International Division became available as the result of a corporate reorganization. According to the defendants, "Lakis was offered the position based on her qualifications, the favorable impression she created during her interviews, her 8 years of Human Resources experience with the Company, and her 13 years of service with the Company." In short, the defendants maintain that their decision to terminate the plaintiff was based on three legitimate non-discriminatory reasons: (1) the nature of the Human Resources position had changed since the plant was to remain open longer than originally anticipated; (2) the Company believed it needed a more experienced and more qualified person to fill this role; and (3) Lakis had 13 years with the Company and eight years experience in human resources work. In the Court's view, these reasons are sufficient to constitute legitimate non-discriminatory reasons for Brennan's discharge.

Once the Court finds that the employer has stated a legitimate reason for the termination, the burden is on the plaintiff to set forth evidence that the defendants' reasons for the discharge constitute a pretext for unlawful discrimination. *Id.* The Company argues that the plaintiff has failed to produce such evidence, and as a result, it is entitled to summary judgment as a matter of law. For the sake of clarity, the Court will address each of the plaintiff's three discrimination claims separately.

### 1. *Age discrimination*

■ The defendants argue that the plaintiff has failed to put forth sufficient evidence that would establish that the Company reason for the termination was a pretext for age discrimination. In support of their position, the defendants argue that the plaintiff was hired and fired by the same person and was a member of a protected class both at the time he was hired, and when he was discharged shortly thereafter. Indeed, some courts recognize that under such circumstances, "a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Proud v. Stone,* 945 F.2d 796, 797 (4th Cir. 1991); *see also Brown v. CSC Logic, Inc.,* 82 F.3d 651, 658 (5th Cir.1996) (recognizing this inference); *Rand v. CF Indus., Inc.,* 42 F.3d 1139, 1147 (7th Cir.1994) (plaintiff hired at

age 47 and fired by the same person two years later failed to establish a claim for age discrimination); *Lowe v. J.B. Hunt Transp., Inc.,* 963 F.2d 173, 175 (8th Cir.1992) ("it is simply incredible, in light of the weaknesses of plaintiff's evidence otherwise, that the company officials who hired him at age fifty-one had suddenly developed an aversion to older people less than two years later").

Although the Second Circuit has not yet ruled on the validity of this inference, the Court finds its application, even if not appropriate in all cases, is appropriate here. The only evidence that the plaintiff offers of pretext is that during his deposition, Borgel stated that he was interested in recruiting "junior" people and giving them "on-the-job training" to enhance their career [sic]. Brennan Aff. Exh R. Borgel Dep. at 151–52. Yet, in spite of these representations, the defendants hired a younger employee with more experience than the plaintiff. In the Court's view, these allegations alone, are insufficient to support a claim for age discrimination. The plaintiff was over 40 years old both when he was initially hired and when he was rehired. He was hired and fired by the same individuals and his entire employment with the defendants lasted less than three years. Further, when he was replaced on both occasions, it was by a woman who 40 years old, not much younger than him. Accordingly, the defendants motion for summary judgment dismissing the plaintiff's age discrimination claims is granted.

### 2. *Disability discrimination*

■ The Court reaches a different conclusion with respect to Brennan's disability discrimination claim. In addition to establishing a prima facie case under the ADA, the plaintiff further contends that he was regularly harassed with respect to disability. As set forth above, Brennan testified in deposition that:

On several occasions Mr. Irvin made fun of the fact that I have a seizure disorder and asked me if that was in any way shape or form affecting the function of my brain because he didn't think I was making a very good decision on one thing or another.

On more than one occasion that was done.

Further, the plaintiff recalled:

Tim has a very favorite phrase, he calls it "no brainer," and he would apply the "no brainer" thing to me on if not a regular basis, an occasional basis, was my brain not functioning right, was it the army thing that you have there, ha, ha, he would laugh, is that affecting your way of thinking on this project or whatever? No, it was not.

[A "no brainer"] means something that requires very little or no thought whatsoever, as a sort of mechanical response necessary to accomplish whatever the task is.

Brennan also testified that Irvin:

said, "I don't know what's going on with your brain, is it that thing you have from the army that's affecting your thoughts on this one?"

He made several references to it.

\* \* \* \* \* \*

[He would consistently comment] it was "that army thing, that thing you have from the army. Is that what's making your brain malfunction? This is really a no-brainer. Is that affecting your brain."

*Id.* Exh. Y, Deposition of Richard J. Brennan, at 111–15. In the Court's view, assuming these allegations to be true, Brennan has produced sufficient evidence of pretext to deny the defendants' motion for summary judgment with respect to this cause of action.

In reaching this conclusion the Court briefly notes the defendants argument that "Irvin denies that he ever made such comments," "that he was very flexible in allowing Brennan time off … for his disabilities," and that the defendants hired and rehired the plaintiff with full knowledge of his disability. In the Court's view, the Company's position does nothing more than create issues of fact as to the plaintiff's claims, thereby making a trial necessary.

The Court further notes that in a footnote in its reply papers, the Company argues for the first time that the plaintiff's ADA claim should be dismissed because he has not produced evidence that he "is substantially limit-

ed in a major life activity," in other words, that he is not disabled under the ADA. *See* 42 U.S.C. § 12102(2) (defining the term "disability"). In the Court's view, it is entirely inappropriate to raise such an argument in this fashion. In their original moving papers, the Company conceded that the plaintiff is a "disabled veteran." To then challenge Brennan's disabled status for the first time in its reply papers would constitute an unfair surprise depriving the plaintiff of an opportunity to address this issue. Accordingly, while the Court notes that the plaintiff will be required to demonstrate that he is disabled under the ADA at trial, the Court will not further address the issue in the context of the defendants' summary judgment motion.

### 3. *Gender discrimination*

 Finally, the defendants argue that the plaintiff has failed to offer sufficient evidence that his discharge was a pretext for gender discrimination, thereby rendering summary judgment appropriate. According to Company, the plaintiff has offered "no direct evidence, statistical evidence or anecdotal evidence that defendant (or Irvin and Borgel, both of whom are male) discriminate against male employees." This statement however directly contradicts the plaintiff's claim that he was advised that the defendants had to find a position for Lakis for fear that she would make "EEOC problems and trouble." Although "Irvin and Borgel deny that they ever made such statements to plaintiff, and deny that this was ever a consideration in their decision to replace [the] plaintiff," the Court finds that such allegations create an issue of material fact as to Brennan's gender discrimination claims, rendering resolution of this issue on a summary judgment motion inappropriate. This is so even if the Court were to apply the heightened standard employed by some courts in reverse discrimination suits. *See, e.g., Olenick,* 881 F.Supp. at 114. Accordingly, the defendants' motion is denied in this respect.

In reaching this conclusion the Court notes the defendants argument that even if the plaintiff's allegations regarding the Company's fear of discrimination charges brought by Lakis were true, such an argument would not support a claim for gender discrimination because it addresses a given employee's "litigiousness" not her gender, or that of the plaintiff. In the Court's view, this argument cannot be resolved on a motion for summary judgment. Assuming that Lakis was retained because of her predisposition to file discrimination charges, this decision begs the question, why discharge Brennan, a male, as a opposed to another female. The evidence at trial may demonstrate that the defendants thought it safer to terminate a male rather than a female, a determination which could support a claim for reverse discrimination. As a result, the Court believes that this issue is better resolved at trial, once all the evidence has been adduced.

### III. *Conclusion*

Having reviewed the parties' submissions, and for the reasons set forth above, it is hereby

ORDERED, that the defendants' motion for summary judgment with respect to the plaintiff's age discrimination claim is granted, and that cause of action is dismissed; it is further

ORDERED, that the defendants' motion for summary judgment with respect to the plaintiff's claims for disability discrimination and reverse gender discrimination is denied; and it is further

ORDERED, that the parties are directed to appear on Tuesday, February 18, 1997 at 9:00 a.m. for jury selection with respect to the remaining causes of action.

SO ORDERED.