16-480(L)
Outlaw v. City of Hartford

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2016

(Argued: January 17, 2017                              Decided: March 7, 2018)

Docket No. 16-480(L), 16-635(XAP)

_____

TYLON C. OUTLAW,

*Plaintiff-Appellant-Cross-Appellee,*

- v. -

CITY OF HARTFORD,

*Defendant-Appellee,*

OFFICER MICHAEL ALLEN, in his individual capacity,

*Defendant-Cross-Appellant,*

DETECTIVE TROY GORDON, in his individual capacity,

*Defendant.*[*]

_____

Before: KATZMANN, *Chief Judge*, KEARSE and LIVINGSTON, *Circuit Judges*.

---

[*]     The Clerk of Court is directed to amend the official caption to conform with the above.

Appeal by plaintiff from so much of a judgment of the United States District Court for the District of Connecticut, Geoffrey W. Crawford, *Judge*, as granted summary judgment dismissing his claims against defendant City of Hartford (the "City"), brought principally under 42 U.S.C. § 1983, for failing to supervise its police officers with respect to appropriate use of force; cross-appeal by defendant police officer Michael Allen from so much of the judgment as orders him to pay plaintiff $454,197 in damages following (a) express jury findings that Allen injured plaintiff by intentionally or recklessly using excessive force, in violation of the United States Constitution and the Constitution of the State of Connecticut, and (b) the court's ruling that Allen is not entitled to qualified immunity. Plaintiff contends principally that the district court erred in granting summary judgment in favor of the City, given evidence he proffered to show deliberate indifference by the City to numerous civilian complaints of excessive force by its police officers. Defendant Allen contends principally that he is entitled to qualified immunity on the constitutional claims because of the jury's verdict in his favor on plaintiff's claim against him for assault and battery in violation of state law, and that factual findings by the district court-- which the parties had agreed should resolve all aspects of his qualified immunity

2

defense--should be set aside as inconsistent with factual findings he imputes to the jury.

On the appeal, we conclude that the district court did not err in granting summary judgment in favor of the City on plaintiff's municipal liability claims on the ground that the evidence proffered by plaintiff was insufficient to permit an inference of deliberate indifference. We conclude that the cross-appeal is without merit given that as to an affirmative defense of qualified immunity, the burden is on the defendant to prove the necessary factual predicates by a preponderance of the evidence; that in order to avoid having the court instruct the jury that he had that burden, Allen chose not to have submitted to the jury the fact questions as to which he now wants favorable answers presumed; and that the pertinent factual findings made by the district court are not inconsistent with the jury's answers to the questions that were posed.

Affirmed.

RAYMOND J. RIGAT, Clinton, Connecticut, *for Plaintiff-Appellant-Cross-Appellee.*

NATHALIE FEOLA-GUERRIERI, Senior Assistant Corporation Counsel, Hartford, Connecticut, *for Defendant-Appellee.*

3

WILLIAM J. MELLEY III, Hartford, Connecticut, *for Defendant-Cross-Appellant*.

KEARSE, *Circuit Judge*:

Plaintiff Tylon C. Outlaw appeals from so much of a judgment of the United States District Court for the District of Connecticut, Geoffrey W. Crawford, *Judge*[**], as summarily dismissed his claims against defendant City of Hartford (the "City"), brought principally under 42 U.S.C. § 1983, alleging deliberate indifference in the supervision of police officers with respect to appropriate use of force, and seeking to hold the City responsible for the use by defendant Michael Allen, an officer in the Hartford Police Department ("HPD"), of excessive force to arrest Outlaw, in violation of his rights under the Fourth Amendment to the United States Constitution and under the Constitution of the State of Connecticut. The district court granted summary judgment to the City, dismissing those claims on the ground that Outlaw proffered insufficient evidence to permit an inference that the City had a policy or custom of failing to supervise its police officers in the use of force or that the City's

---

[**] Judge Geoffrey W. Crawford, of the United States District Court for the District of Vermont, sitting by designation.

customs or policies caused Outlaw's injuries. *See Outlaw v. City of Hartford*, No. 3:07-cv-01769, 2015 WL 1538230, at *6-*12 (D. Conn. Apr. 6, 2015) ("*Outlaw I*"). Outlaw contends that summary judgment was inappropriate, given the evidence he proffered to show that the City had exhibited deliberate indifference to numerous civilian complaints of excessive force by its police officers.

Allen cross-appeals from so much of the district court's judgment as orders him to pay Outlaw $454,197 in damages following express jury findings that Allen injured Outlaw by intentionally or recklessly using excessive force, in violation of the United States and Connecticut Constitutions. Allen contends that he is entitled to qualified immunity on those claims in light of the jury's verdict against Outlaw on Outlaw's claim for assault and battery in violation of state law, and that posttrial factual findings by the district court, made in ruling that Allen is not entitled to qualified immunity for the constitutional violations, *see Outlaw v. City of Hartford*, No. 3:07-cv-01769, 2016 WL 591753 (D. Conn. Feb. 12, 2016) ("*Outlaw II*"), should be set aside as inconsistent with findings that Allen imputes to the jury.

On the appeal, we conclude that the district court did not err in ruling that the evidence proffered by Outlaw in support of his municipal liability claims was

insufficient to permit an inference of deliberate indifference on the part of the City to the use of excessive force by HPD officers. On the cross-appeal, we conclude that Allen's contentions are without merit given that, as qualified immunity is an affirmative defense, the burden was on Allen to prove by a preponderance of the evidence any factual predicates necessary to establish that defense; that in order to avoid having the court instruct the jury that he had that burden, Allen chose not to have submitted to the jury the fact questions as to which he now wants favorable answers presumed; that the jury's answers to the interrogatories accompanying its verdict did not imply the factual findings that Allen imputes to the jury; and that the pertinent factual findings by the district court are not inconsistent with the jury's answers to questions that were posed.

# I. BACKGROUND

On the night of December 17, 2004, Allen and HPD Detective Troy Gordon confronted and arrested 30-year-old Tylon Outlaw on a downtown street in Hartford, Connecticut. Outlaw was charged with breach of peace, being intoxicated

in the roadway, threatening a police officer, and assault on a police officer. The charges were resolved in 2005 by Outlaw's entry of an *Alford* plea to the offense of creating a public disturbance, *see North Carolina v. Alford*, 400 U.S. 25 (1970), which is "'simply a guilty plea, with evidence in the record of guilt, typically accompanied by the defendant's protestation of innocence and his or her unequivocal desire to enter the plea,'" *Outlaw I*, 2015 WL 1538230, at *2 n.1 (quoting *Abimbola v. Ashcroft*, 378 F.3d 173, 181 (2d Cir. 2004) (other internal quotation marks omitted)). The arrest occurred after Allen had repeatedly struck Outlaw with a police baton, bloodying his head in several places and breaking his knee.

Outlaw brought the present § 1983 action in 2007 against Allen, Gordon, and the City, alleging principally that Allen and Gordon had caused his injuries by using excessive force in violation of the Fourth Amendment, and that the City was liable for their conduct because it had a policy or custom of deliberate indifference in failing to train and supervise its police officers as to appropriate use of force during an arrest. Outlaw also asserted claims under the Connecticut Constitution and Connecticut common law.

A. *Pretrial Rulings*

Following years of discovery, defendants moved for summary judgment dismissing the complaint. In *Outlaw I*, the district court granted the motion to dismiss the Fourth Amendment claim and similar state-law claims against the City, ruling, to the extent pertinent to Outlaw's appeal, that the evidence Outlaw proffered was insufficient to establish that the City had a policy or custom of indifference that caused Outlaw's injuries (*see* Part III below).

The district court denied the individual defendants' motions for summary judgment dismissing the Fourth Amendment and Connecticut constitutional claims of excessive force and the state-law claims of intentional infliction of emotional distress, ruling that there were genuine issues of material fact to be tried. *See Outlaw I*, 2015 WL 1538230, at *3-*6, *12-*14. The court granted the motions to dismiss Outlaw's other constitutional and state-law claims; however, following a motion by Outlaw for reconsideration, it reinstated the state-law claims against Gordon and Allen for assault and battery.

B. *The Trial*

In 2016, Outlaw's surviving constitutional and common-law tort claims against Allen and Gordon were tried to a jury, which heard two versions of the December 2004 incident: one from Outlaw and several bystanders, the other from Allen and Gordon.

1. *Outlaw's Testimony*

Outlaw testified that on the night of December 17, 2004, he drove to downtown Hartford to meet his friend Nick Sackandy at a restaurant on Union Place (the "Restaurant") to discuss a proposed business venture. Outlaw arrived around 10 p.m., drank most of one beer, and left around 11:00 or 11:15. As he was returning to his car, walking south on Union Place toward its intersection with Allyn Street, Outlaw heard his name being called from a double-parked taxi; the driver was his high school friend Anthony Carroll. While Outlaw was crossing the street toward the taxi, a Ford Taurus was inching north on Union Place toward the taxi, and the Taurus's driver--who Outlaw later learned was Detective Gordon--shouted at Outlaw, "hey, mother fucker" (Trial Transcript January 4, 2016 ("Jan. 4 Tr."), at 27). Thinking

9

the driver might be an acquaintance, Outlaw returned the greetings (characterized at trial as "inner city" "pleasantries" (Trial Transcript January 5, 2016 ("Jan. 5 Tr."), at 50; Jan. 4 Tr. 54)), then walked around to the driver side of the taxi. As Outlaw was speaking with the rear-seat passengers, who were also friends of his, the Taurus, which bore no markings to indicate that it was a police vehicle, pulled up behind the taxi; Gordon, who had not identified himself as a police officer, summoned Outlaw to the Taurus. Outlaw waved him off. The Taurus then slowly moved past the taxi and stopped two or three car lengths ahead.

Gordon, dressed in plain clothes, jumped out of his car and approached Outlaw "aggressively" (Jan. 5. Tr. 59), carrying a black object that Outlaw thought was a gun. Gordon kicked Outlaw in the stomach, which did not hurt him but sent him stumbling backward. (*See id*. at 63; Jan. 4 Tr. 36-37.) Gordon kicked again toward Outlaw, but Outlaw blocked that kick with his hands; however, at almost the same instant Outlaw was struck on the back of his head with "a bat-like object" (Jan. 4 Tr. 37), which he eventually learned was a police baton wielded by Allen.

Outlaw fell to the ground, yelling for help. While on the ground on his back or curled into a fetal position, he was repeatedly struck in the head, arms, and

legs with a baton and was kicked in the back and stomach. Outlaw had not said anything to Gordon after their initial exchange of "pleasantries" (Jan 5. Tr. 56-57); he had never moved in Gordon's direction, never raised his hand, and never attempted to punch or kick Gordon; Outlaw's only attempt to defend himself was to curl up and try to cover targeted areas of his body. He testified that while he was down, Gordon kicked him in the face; and when Outlaw tried to cover his face and head, Allen hit him in the right knee with the baton, breaking the kneecap, leaving Outlaw unable to move his leg, and causing him the most pain that he (a former high school, college, and professional football player) had ever experienced.

Outlaw testified that Gordon never displayed a badge; and during the incident, neither Gordon nor Allen ever identified himself as a police officer. Outlaw had the impression that there were people other than Allen and Gordon hitting and kicking him while he was on the ground (in his deposition, Outlaw had said that Gordon, after initially kicking him in the stomach, had not kicked or punched him again (*see* Jan. 5 Tr. 69)). Outlaw testified that none of the people hitting or kicking him identified themselves as police officers.

Eventually Allen placed Outlaw face down on the pavement and cuffed

11

his hands behind his back. He then grabbed Outlaw by the collar, dragged him for 60-odd feet, and threw him to the pavement between parked cars, where Outlaw landed on his face. While they awaited the arrival of an ambulance, blood was dripping from Outlaw's head and face.

At the hospital, Outlaw received stitches to his eyebrow and staples in three other places on his head. Surgery was performed on his broken kneecap; a metal strip was installed in the knee to cover the kneecap, held in place with metal screws. After the knee surgery, the police shackled Outlaw's legs to his bed. Outlaw endured a lengthy convalescence. He needed crutches or a cane for six months and had two additional operations on his knee.

2. *Testimony by Onlookers*

Rachel Killian-Lallier ("Killian") was a passenger in Carroll's taxi on the night in question. She testified that she and her then-boyfriend, in the back seats, and Carroll and his uncle, in the front seats, were chatting with Outlaw, who was standing on the driver side of the taxi, when a car came along and parked about a car length away. A man--undisputedly Gordon--got out of the car; he was not wearing

any kind of police uniform, and Killian never saw a badge on him or heard him indicate to anyone that he was a police officer. Gordon appeared to be "very angry" and "walk[ed] very aggressively towards" Outlaw, as if he were on a mission (Jan 5. Tr. 103, 113); he kicked Outlaw, apparently in the abdomen. Soon a number of other people, including police officers, arrived and piled onto Outlaw, who was on the ground, and began punching him.

Killian testified that Outlaw had never moved toward Gordon, and that she never heard Gordon or the others who piled onto Outlaw identify themselves as police officers.

Carroll, the taxi's driver, similarly described Gordon as "angry" and "raged." (Jan 5. Tr. 142.) He testified that he saw Gordon rush from his vehicle and kick Outlaw and that he saw several other people, some in police uniforms, rush in to punch Outlaw and pile on him on the ground. Carroll never heard Gordon identify himself as a police officer; it was only when Carroll left his taxi to check on Outlaw at the bottom of the pile of people hitting him that Carroll saw Gordon remove a badge from under his shirt.

13

Sackandy testified that in the meeting at the Restaurant, Outlaw had drunk one beer and no other alcohol. Outlaw had left after about an hour. Sackandy testified that not long after Outlaw left, John Stengel, a friend of Sackandy, arrived, excitedly saying that Hartford policemen were "beating the shit out of some guy outside." (Jan. 5 Tr. 126, 129.)

Stengel, who on December 17, 2004, had never met Outlaw and had not socialized with him since, testified that he had been walking north on Union Place that night toward the Restaurant when he saw a "pretty brutal" interaction involving five or six people, some in police uniform, "beating somebody up pretty badly, kicking, throwing punches." (*Id*. at 170, 172.) Stengel saw no resistance by the person who was on the ground being beaten.

3. *The Testimony of Gordon*

Gordon testified that on the night of December 17, 2004, before his encounter with Outlaw, he had responded to a reported assault on Allyn Street. At Allyn Street, he did not see a fight, and it was decided that there was nothing for the police to do. Gordon then drove to the end of Allyn and turned right onto Union

Place, a one-way street. Gordon saw cars parked along both sides of Union Place and saw a double-parked vehicle on the left, with a man--Outlaw, whom Gordon did not know--standing at the front passenger-side window.

Gordon testified that he asked Outlaw to please move out of the roadway. Gordon was driving a Ford Taurus with no visible police indicia, was dressed in plain clothes, and did not identify himself as a police officer. Gordon testified that Outlaw responded, "why don't you shut the F[uck] up." (Trial Transcript January 6, 2016 ("Jan. 6 Tr."), at 87). Gordon repeated his request, to which Outlaw responded, "why don't you get out of the car and see what happens." (*Id*. at 89.) Gordon began driving away; but when he heard Outlaw say, "if you get out of that car I'm going to kick your A[ss]" (*id*.), he interpreted that as a threat and decided to arrest Outlaw. He parked his car some two car lengths ahead of the double-parked car--where Outlaw, Gordon testified, was still on the passenger side-- and moved his badge from under his shirt to the surface of his clothing to make it visible.

With his radio in hand, Gordon exited his car and approached Outlaw. He testified that Outlaw moved toward him and threw a punch, striking him in the

15

upper chest; Gordon leaned back and defensively kicked Outlaw in the shin. After that kick, he never touched Outlaw again. Gordon testified that he never announced that he was a police officer "because [he] did not have time." (Jan. 6 Tr. 137.) Other officers appeared suddenly and subdued Outlaw, taking him to the ground. Gordon never heard anyone identify himself as a police officer.

4. *The Testimony of Allen*

Allen testified that on the night of December 17, 2004, he was on patrol in uniform and driving a police cruiser; he was dispatched to Allyn Street to deal with a report of a serious assault. Gordon also arrived at the scene in response to the report. When the officers did not find there either a suspect or a victim, they left Allyn Street. Gordon, in his unmarked car, turned right onto Union Place; Allen, in his cruiser, followed.

Allen testified that on Union Place, he saw an individual--eventually identified as Outlaw--standing at the passenger side of a taxi and that Outlaw was "block[ing] the flow of the northbound traffic that could have gone around the taxicab" (Jan. 6 Tr. 160). Allen stopped his cruiser after Gordon had stopped his

unmarked car and exited, blocking traffic.

Allen had not seen or heard any conversation between Gordon and Outlaw. He testified that he saw Gordon approach Outlaw and then saw Outlaw "lunge" toward Gordon and throw "several punches to [Gordon's] face and chest area." (*Id*. at 163.) Allen testified that he exited his cruiser, "hollered," and "identified" himself as a police officer. (*Id*. at 165.) He testified that Outlaw had grabbed Gordon's clothing, and as Outlaw cocked his right arm to deliver another blow, Allen struck Outlaw's right biceps with his baton. Outlaw did not react, but cocked his arm to hit Gordon again. Allen, attempting to protect Gordon from serious injury, swung at Outlaw's arm a second time.

Allen described Outlaw as dropping to the ground "on his butt and elbows" and assaulting Allen with his legs, "violently struggling with [Allen] resisting arrest." (*Id*. at 166-67.) Other officers came to Allen's assistance in making the arrest. Allen testified that he had used only necessary force, that there were no unnecessary blows. Allen swung his baton at Outlaw's thigh and calf; he testified that he did not hit Outlaw's knee.

17

Allen testified that when he "was escorting Mr. Outlaw to the cruiser," he "noticed there was some blood on [Outlaw's] scalp." (Jan. 6 Tr. 166.) He said he "assumed" that he had hit Outlaw's head with his nightstick. (*Id.*) He acknowledged that he had testified in deposition that his second swing had struck Outlaw in the head.

5. *The Verdicts*

After being instructed as to the law governing Outlaw's claims of excessive force in violation of the United States Constitution and the Connecticut Constitution (*see* Part II.B. below) and his state-law claims of assault and battery (*see* Part II.C. below) and intentional infliction of emotional distress (or "IIED"), the jury was given a Verdict Form containing interrogatories asking whether Outlaw had proven those claims and had proven that either defendant's conduct caused him injury. Each set of questions dealt separately with Allen or Gordon.

The jury found that Outlaw had not proven any of his claims against Gordon. It answered "No" to the questions whether Gordon had used excessive force, or had applied force or violence in an unlawful manner, or had acted in a manner

18

intended to subject Outlaw to emotional distress. (*See* Verdict Form questions 1, 7, 13, 17.)

As to Allen, the jury found that Outlaw had proven that Allen used excessive force, had done so intentionally or recklessly, and had thereby caused Outlaw injury. The questions and answers were:

## II. FEDERAL CIVIL RIGHTS CLAIM AGAINST DEFENDANT ALLEN

4. Did defendant Michael Allen employ excessive force against plaintiff on December 17, 2004? *YES*.

5. Did defendant Michael Allen act intentionally or recklessly in employing excessive force against plaintiff on December 17, 2004? *YES*.

6. Did the use of excessive force by defendant Michael Allen cause plaintiff to suffer injury? *YES*.

(Verdict Form questions 4-6.)

## IV. CONNECTICUT CONSTITUTIONAL CLAIMS AGAINST DEFENDANT ALLEN

10. Did defendant Michael Allen violate the plaintiff's civil rights under the Connecticut Constitution by employing excessive force against plaintiff [o]n December 17, 2004? *YES*.

11. Did defendant Michael Allen act intentionally or

19

recklessly in employing excessive force against plaintiff on December 17, 2004? *YES*.

12. Did the use of excessive force by defendant Michael Allen cause plaintiff to suffer injury? *YES*.

(Verdict Form questions 10-12.) The jury found, however, that Outlaw had not proven his state-law claims against Allen for assault and battery or IIED:

**VI.  ASSAULT and BATTERY CLAIM AGAINST DEFENDANT ALLEN**

15. Do you find that defendant Michael Allen applied force or violence to plaintiff's body in an unlawful manner? *NO*.

. . . .

**VIII.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS  CLAIM AGAINST DEFENDANT ALLEN**

20. Did defendant Michael Allen act towards plaintiff in a manner intended to inflict emotional distress or which he should have known would cause emotional distress? *NO*.

(Verdict Form questions 15, 20.)

The Verdict Form instructed the jury that if it answered "Yes" to any set of questions against either defendant, it should determine the damages Outlaw should recover for the injuries proven. Having found against Allen on the excessive

20

force claims, the jury awarded Outlaw $408,197 for pain, suffering, emotional distress, and loss of enjoyment of life. (*See* Verdict Form Part IX.) Although the jury awarded Outlaw $111,803 for past and future medical expenses, the parties stipulated that that sum should be reduced to $46,000.

C. *The Court's Rulings on Allen's Defense of Qualified Immunity*

No questions had been submitted to the jury as to facts for predicates of the individual defendants' defense of qualified immunity. In the conference discussing the instructions to be given to the jury, the court had stated that if it posed such questions, it would instruct the jury that as to those factual issues, the burden of proof is on the defendants. (*See* Charge Conference January 6, 2016 ("Conf. Tr."), at 11-12 ("[T]he burden of proof is different . . . . So if they are going to be making factual determinations . . . they have to be applying the right burden of proof. And it's different [as to] qualified immunity because it's on . . . the defense as opposed to on the plaintiff that carries it for everything else. . . . I'm not going to do it unless I can explain to them what questions they are answering . . . and who['s] got the burden of proof.").)

Counsel for Allen and Gordon responded that that would be "very confusing" (*id*. at 12) and ultimately asked that no questions be put to the jury as to facts on which the qualified immunity defense would be predicated (*see id*. at 36-39, 40, 42). The parties agreed that any necessary factual findings would be made by the court. Defense counsel said, "Your Honor has that on your lap, period." (*Id*. at 37.)

Following the jury's verdict against Allen on the excessive force claims, Allen and Outlaw submitted briefs with regard to the defense of qualified immunity. Allen argued principally that

> by finding Detective Gordon not responsible for any tort, the jury rejected the majority of the plaintiff's claims. The issue of *the conduct of the plaintiff was found to necessitate the actions of Detective Gordon*. The movement of the plaintiff, his language, his aggressive action, his failure to stop and his general demeanor, all as described by Detective Gordon, *were found* to be contrary to the statements of the plaintiff.

(Defendant Michael Allen's Brief Regarding Qualified Immunity ("Allen's QI Mem.") at 2 (emphases added); *see also id*. at 4 ("The jury believed Detective Gordon's testimony that the Plaintiff hit, or was attempting to hit, him.").)

Allen also argued that because the jury found against Outlaw on his claim of assault, it "had to have found that *[Allen's] actions* were justified under state

22

law." (*Id*. at 4 (emphasis added); *see id*. at 6 ("The court had charged the jury on the justification for force which *presumably* the jury found. Because the *jury of necessity found* that the application of *the* force was not unlawful, Officer Allen is entitled to qualified immunity for his actions." (emphases added))). He noted that the court had instructed in part as follows:

> "Under Connecticut law, a police officer is justified in using physical force upon another person when and to the extent he or she reasonably believes such to be necessary to effect an arrest or to defend himself or herself or a third party from the use or imminent use of physical force while effecting or attempting to effect an arrest. . . .
>
> In determining whether a defendant reasonably believed that the use of physical force was necessary to arrest plaintiff or to prevent him from harming the officers or others, you should take into account all of the circumstances of the incident. You should consider this instruction in deciding whether the defendants violated the Connecticut Constitution or committed an assault and battery upon the plaintiff."

(*Id*. at 7 (quoting Jury Instructions and Trial Transcript January 7, 2016 ("Instr./Tr. Tr."), at 24-25) (emphasis omitted).) Allen argued that in light of this charge, the jury's verdict in his favor on assault and battery "*represents specific findings*" that he "reasonably *could have* believed," and did *"reasonabl[y] believe*[]" that "the force he used was reasonable and necessary to effectuate [Outlaw's] arrest." (Allen's QI Mem. at 7-8

23

(emphases added).)

Allen also argued that he was "entitled to qualified immunity because his actions did not violate any clearly established statutory or constitutional right concerning the use of batons *where a fellow officer was being assaulted*." (*Id*. at 4 (emphasis added).) He argued that "[t]he United States Supreme Court has not addressed the use of batons in the context of excessive force claims," and that a district court case had held it "not [to be] excessive force for an officer to use his baton against three *men who were approaching him threateningly*, at least one of whom had been drinking." (*Id*. at 3, 4 (emphasis added).)

In *Outlaw II*, the district court rejected Allen's contentions and made findings of specific facts as to which the jury had been asked no questions. As to Outlaw's state of sobriety, the court found that Outlaw "had consumed a beer" at the Restaurant but "was not intoxicated." *Outlaw II*, 2016 WL 591753, at *1. As to the interactions between Outlaw and Gordon, the court's findings included the following:

> From his unmarked car, Detective Gordon called out to Plaintiff and ordered him out of the road. The accounts differ on whether he delivered a civil and professional request or whether he used profane language. *It is undisputed that he did not identify himself as a police officer*. With his back turned to the road, Plaintiff made a dismissive "brush off" gesture. He ignored Detective

24

Gordon and continued his conversation with the occupants of the cab. *Plaintiff had no idea that a police officer had directed him to leave the road.*

Detective Gordon pulled past the taxi cab, parked, and moved quickly on foot towards Plaintiff. *He did not identify himself as a police officer.* He carried an unlit flashlight [*sic*] in his right hand. He wore a badge around his neck, which he had pulled out of his shirt. He also wore a winter jacket. *The badge was not visible to Plaintiff who still had no idea that the man who had spoken to him from his car and was now moving towards him was a police officer*[.] Rather[,] Plaintiff saw a stranger approaching him on an unlit street *carrying an object that he feared was a gun. . . .*

Detective Gordon kicked Plaintiff in the chest as soon as he reached him. . . . Officer Allen, who had witnessed these events, got out of his cruiser and pulled out his baton. *He came up behind Plaintiff and struck him repeatedly on the head, cutting his scalp each time. The photographs admitted into evidence show three distinct scalp lacerations. Officer Allen also did not identify himself as a police officer before hitting Plaintiff.*

Plaintiff fell to the ground and curled up in a fetal position with his hands seeking to protect his head. *As Plaintiff lay on the ground, Officer Allen struck him again on the right knee with the baton.* Several other Hartford police officers not named in this lawsuit arrived and joined in beating Plaintiff while he lay on the ground. . . .

. . . .

At trial, each side blamed the other for causing the altercation. *The court finds that Plaintiff's version of the events is more credible.*

*Id.* at *2 (emphases added).

The court addressed the specific circumstances of the encounter, making findings as to, *inter alia*, whether Outlaw had attempted to fight with either Gordon or Allen. As to Gordon, the court found that

> *the testimony by Detective Gordon that Plaintiff struck him or, as Officer Allen testified, that Plaintiff grabbed the detective by the coat, pulled him towards him, and punched him, is not credible* and not true. Plaintiff is more credible when he testified that he was accosted by an unknown man on a dark street whom he feared was holding a gun. Without warning, he was kicked in the midsection by Detective Gordon and then struck from behind by Officer Allen. This testimony is corroborated by the testimony of witnesses in the cab, as well as the undisputed testimony that it was Detective Gordon who got out of his car and approached Plaintiff without identifying himself as a police officer.

*Outlaw II*, 2016 WL 591753, at *3 (emphasis added). As to Allen, the court also found that

> *Officer Al[l]en's testimony that Plaintiff fought with Detective Gordon and then continued to try to kick Officer Allen after being knocked to the ground by a blow to the head is not credible.* Officer Allen struck Plaintiff at least four times with a police baton-- drawing blood with the blows to the head and later breaking Plaintiff's knee. *Plaintiff's version that he was struck from behind by Officer Allen, fell to the ground, attempted to protect his head where he had already been hit, and was then struck on the knee is more credible than Officer Allen's version of the events.*

26

*Id*. (emphases added).

The court also found that Allen hit Outlaw hard enough to break Outlaw's kneecap: "[T]he treating physician testified on cross-examination that . . . he believes the patella was broken by a blow from the baton"; "[t]here was no testimony that Plaintiff struck the pavement with his kneecap or that his fall was actually the cause of the fracture"; and "[t]he jury resolved this issue in Plaintiff's favor when it determined that Officer Allen's conduct was a proximate cause of injury to Plaintiff . . . ." *Id*.

The court rejected Allen's contention that the verdict in his favor on the assault claim meant that the jury found that Outlaw was the aggressor against Gordon and that Allen believed that force was necessary for reasons of safety. The court observed that the elements of the assault and excessive force claims differ and that the different verdicts on those two categories of claims were not necessarily inconsistent. *See id*. at *4.

The court also rejected Allen's contention that the law was not sufficiently clear to alert him that the force he was using against Outlaw was excessive:

> *That the law prohibits excessive force when using force to make an arrest is neither a recent nor surprising development*. Within the

27

District of Connecticut, there are literally hundreds of decisions that articulate this constitutional rule in cases involving police officers. *Many of these decisions issued prior to December 2004 when the incident at issue occurred. . . .*

*Outlaw II*, 2016 WL 591753, at *5 (citing cases) (emphases added).

As these cases demonstrate, it was clearly established by December 2004 that the use of excessive force in the course of an arrest is unlawful. Prior to 2004, Hartford police officers had been sued repeatedly on these grounds and, in each case, the courts consistently articulated the legal standard expressed at the national level in [*Tennessee v. Garner*, 471 U.S. 1 (1985)] and *Graham*[ *v. Connor*, 490 U.S. 386 (1989)]: that the force applied by the police must be reasonable in light of the requirements of the situation.

*Id*. Accordingly, the court found in the present case that

*[a] reasonable officer* in the position of Officer Allen . . . . *would see that the original offense committed by Plaintiff was a minor pedestrian violation--in effect, a jaywalking incident.* He would see that Plaintiff was facing away from Detective Gordon's car and ignoring him. *He would neither see nor hear threats or serious misconduct on the part of Plaintiff. He would see no signs of resistance or aggression by Plaintiff when Detective Gordon confronted Plaintiff. He would not see Plaintiff strike Detective Gordon or pose a threat to Detective Gordon's safety.*

*Id*. (emphases added). Outlaw was "on the ground, unresisting and protecting his head with his hands," and Allen "continu[ed] to strike Plaintiff with his baton with enough force to fracture Plaintiff's knee cap." *Id*.

28

The court is aware that Officer Allen describes the incident differently and alleges that Plaintiff violently attacked Detective Gordon with his fist. For purposes of the qualified immunity issue, *the court does not believe Officer Allen's version of the events.* Instead, *the court has found that Plaintiff never fought with either officer. The court does not believe Officer Allen's description that Plaintiff continued to struggle and kick at the officers once on the ground.* As the factual findings show, *it is more likely that Plaintiff's account of curling up and seeking to protect his head is the accurate one.*

*Id*. at *6 (emphases added). The court added:

It is obvious from this description of events that *a reasonable officer, armed with the same information as Officer Allen, would have little doubt about the unlawfulness of repeatedly striking an unresisting man with his baton. See Belanger v. City of Hartford*, 578 F. Supp. 2d 360, 366 (D. Conn. 2008) ("A reasonable police officer should know that swinging a baton at an individual's face while they are facing away from the officer without prior warning would constitute a violation of that individual's right to be free from excessive force" [discussing events that occurred on December 23, 2004]).

*Outlaw II*, 2016 WL 591753, at *6 (emphasis added).

*A reasonable officer* in Officer Allen's position would have seen that Plaintiff had not committed a violent or serious crime. *He would have seen that Plaintiff had not attempted to flee or resist.* He would have seen Detective Gordon push Plaintiff backwards with a kick. He neither identified himself as a police officer nor heard Detective Gordon do so. *Under these facts, and given that Plaintiff posed no threat to the officers or the public safety, striking Plaintiff from behind with a baton and then continuing to strike him as he lay on the ground must be viewed as a clear violation of Plaintiff's Fourth Amendment rights under the law in effect at the time.*

29

*Id.* (emphases added). The court "conclude[d] that qualified immunity is not available to Officer Allen in light of the facts of this case." *Id*.

Judgment was entered in Outlaw's favor against Allen on the claims of excessive force in violation of the federal and state constitutions in the amount of $454,197.

## II.  ALLEN'S CHALLENGES TO THE JUDGMENT AGAINST HIM

In his cross-appeal, Allen does not challenge the jury's findings that in connection with arresting Outlaw he caused Outlaw injury by intentionally or recklessly using excessive force.  Nor, he professes, does he contend that there was any inconsistency in the jury's verdict (*see* Allen reply brief on appeal at 4 ("The jury's finding that Officer Allen used excessive force is not inconsistent with its finding that Officer Allen was not liable for assault and battery."); *id*. at 9 ("there is no disagreement in that both parties are claiming the jury's findings on excessive force and assault are not inconsistent and both parties appear to be saying that the jury finding of no assault is explained in light of the instruction that *some* force can be a

defense in a claim of assault" (emphasis added))).

Rather, Allen states that "the only ruling presented for review [on his cross-appeal] is the [posttrial] decision by [the district judge] that Officer Michael Allen is not entitled to qualified immunity for his actions . . . ." (Allen brief on appeal at 10.) In support of his challenge to the court's rejection of his claim of entitlement to immunity, Allen pursues the posttrial arguments he made in the district court, contending that there were exonerative facts that the jury "found" (*e.g.*, Allen brief on appeal at 21), or "had to have" found (*e.g.*, *id*. at 20, 29), or "necessarily found" (*e.g.*, *id*. at 11, 19, 25; Allen reply brief on appeal at 2, 4, 6, 10). He argues that the district court's decision in *Outlaw II* impermissibly made factual findings that were inconsistent with findings that Allen imputes to the jury, such as that Allen "saw the plaintiff acting aggressively towards Detective Gordon" (Allen brief on appeal at 20) and that Allen "believed that he, Detective Gordon, or a third person was in danger" (*id*. at 29).

Although the purely legal proposition--*i.e.*, that, with respect to any factual issues as to which the parties have a Seventh Amendment right to trial by jury, the court may not properly make factual findings that are contrary to findings made

by the jury--is eminently sound, *see, e.g.*, *Curtis v. Loether*, 415 U.S. 189, 196 n.11 (1974); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 470-73 (1962); *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 431-32 (2d Cir. 1995), *cert. denied*, 518 U.S. 1017 (1996), Allen's contention that the jury necessarily made his hypothesized favorable findings is frivolous. We reach this conclusion based on well-established principles of law and the record in this case.

A. *Excessive Force, Qualified Immunity, and Trial Procedure*

"The Fourth Amendment prohibits the use of excessive force in making an arrest, and whether the force used is excessive is to be analyzed under that Amendment's 'reasonableness standard.'" *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989) (other internal quotation marks omitted)). The "proper application" of this standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Even where an officer is found to have used excessive force, however, the doctrine of qualified immunity will shield

32

that officer from liability for damages if his "conduct d[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted); *see, e.g., Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Whether the law was sufficiently clearly established is itself an issue of law that we consider *de novo*. *See, e.g., Elder v. Holloway*, 510 U.S. 510, 516 (1994).

Allen contends that in December 2004, the law governing his conduct was not sufficiently clearly established because "it was not clearly established that an officer going to the aid of another law enforcement officer should not use a baton on an individual apparently resisting arrest." (*See* Allen brief on appeal at 27.) We reject the factual premises underlying Allen's contention for the reasons set out in Part II.C. below. We disagree with his invocation of the "clearly established" standard because its applicability "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified," *Anderson v. Creighton*, 483 U.S. at 639: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*. at 640. "This is not to say," however, "that an official action is protected by qualified immunity unless the very

33

action in question has previously been held unlawful . . . ." *Id*.

> The unconstitutionality of outrageous conduct obviously will be
> unconstitutional, this being the reason, as Judge Posner has said,
> that "[t]he easiest cases don't even arise." *K.H. v. Morgan*, 914 F.2d
> 846, 851 (C.A.7 1990).

*Safford Unified School District No. 1 v. Redding*, 557 U.S. 364, 377 (2009) (other internal quotation marks omitted). The constitutional prohibition against use of excessive force in making an arrest had been established long before December 2004; no competent police officer could have failed to comprehend that that principle would encompass repeatedly beating an unresisting, supine, jaywalking suspect with a stick.

The qualified immunity standard is an objective standard, asking not whether the defendant officer acted in good faith or what he himself knew or believed, but rather what would have been known to or believed by a reasonable officer in the defendant's position. *See, e.g.*, *Anderson v. Creighton*, 483 U.S. at 640-41. Where the right at issue in the circumstances confronting police officers was clearly established but was violated, the officer will still be entitled to qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights. *See, e.g.*, *id*. at 639-40; *Rogoz v. City of Hartford*, 796 F.3d 236, 247 (2d Cir. 2015); *Kerman v. City of New York*, 374 F.3d 93, 108 (2d Cir. 2004) ("*Kerman*"). "[T]he matter

34

of whether a defendant official's conduct was objectively reasonable, *i.e.*, whether a reasonable official [in the defendant's position] would reasonably believe his conduct did not violate a clearly established right, is a mixed question of law and fact." *Id.* at 109. If there is a "dispute as to the material historical facts, . . . . 'the factual question[s] must be resolved by the factfinder.'" *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) (quoting *Kerman*, 374 F.3d at 109). After the factfinder's "'*deci[sion as to] what the facts were* that the officer faced or perceived,' the court then may 'make the ultimate legal determination of whether qualified immunity attaches *on those facts*.'" *Kerman*, 374 F.3d at 109 (quoting *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (other internal quotation marks omitted) (emphases in *Kerman*)); *see, e.g., Zellner v. Summerlin*, 494 F.3d at 368 ("Once the [factfinder] has resolved any disputed facts that are material to the qualified immunity issue, the ultimate determination of whether the officer's conduct was objectively reasonable is to be made by the court.").

Qualified immunity is an affirmative defense on which the defendant has the burden of proof. *See, e.g., Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Rogoz v. City of Hartford*, 796 F.3d at 247. "To the extent that a particular finding of fact [i]s essential to an affirmative defense, . . . it [i]s incumbent on [the defendant] to request that the

35

[factfinder] be asked the pertinent question." *Kerman*, 374 F.3d at 120.

Usually, if a jury trial has been properly demanded, the factfinder for such questions will be a jury, *see* Fed. R. Civ. P. 38(a) ("The right of trial by jury as declared by the Seventh Amendment to the Constitution--or as provided by a federal statute--is preserved to the parties inviolate."). The jury may be asked to make its findings by answering special interrogatories. *See, e.g.*, *Kerman*, 374 F.3d at 109. When such interrogatories are used, of course, the court will need to give the jury proper "instructions and explanations," Fed. R. Civ. P. 49(a)(2), 49(b)(1), to enable the jury to make its findings in accordance with, *inter alia*, the proper allocation of the burden of proof.

However, the parties may agree to forgo their Seventh Amendment rights, either entirely or with respect to specified issues. *See generally* Fed. R. Civ. P. 38(c) ("In its demand" for a jury trial, "a party may specify the issues that it wishes to have tried by a jury"; but if another party wishes to have additional issues decided by the jury, it may so ensure by serving a timely "demand for jury trial on any other or all factual issues triable by a jury"). Rule 38 also provides that "[a] proper [jury trial] demand may be withdrawn . . . if the parties consent." *Id*. Rule 38(d). Rule 39

36

similarly allows a nonjury trial on issues for which a jury trial was properly demanded under Rule 38 if "the parties or their attorneys file a stipulation to a nonjury trial or so stipulate on the record . . . ." Fed. R. Civ. P. 39(a)(1). These rules mean that the parties, directly or through their attorneys, are allowed to agree to forgo their Seventh Amendment rights on specified factual questions and have those questions decided by the court.

B. *The Jury Instructions on Outlaw's Excessive-Force Claims*

In the present case, the district court properly, and without objection, charged the jury as to, *inter alia*, what it must find Outlaw had proven by a preponderance of the evidence in order to return verdicts in his favor on his claims of excessive force in violation of the federal and state constitutions. It instructed that "a police officer may only use such force as is[] objectively reasonable, under all the circumstances" (Instr./Tr. Tr. 17-18); that "[t]he right to make any arrest or to protect the public or another police officer necessarily carries with it the right to use *some* degree of physical coercion or threat thereof to effect the arrest or to protect" (*id*. at 18 (emphasis added)); that "[a] police officer is *not justified* in using physical force which

37

*exceeds the amount reasonably required* under the conditions of the case" (*id*. (emphases added)); and that "[i]n general, a seizure or arrest of a person *is unreasonable* . . . if a police officer uses *excessive* force" (*id*. at 17 (emphases added)). The court instructed the jury that, under Connecticut law, neither assault nor excessive force in violation of the Connecticut Constitution is proven if the officer's use of force was justified. (*See id*. at 24.)

The court instructed that the jury could "consider all of the circumstances known to the officers on the scene, including" the severity of Outlaw's alleged crime, whether Outlaw posed an immediate threat to the safety of the officers or others, and whether Outlaw was actively resisting arrest or attempting to flee. (*See id*. at 18-19.) It also told the jury that it was free to draw such reasonable inferences as it felt justified in light of the evidence and that it should not abandon common sense. (*See id*. at 6-7, 12.)

We presume, absent any indication to the contrary, that the jury followed the court's instructions, and that the jury, having found that Allen intentionally or recklessly subjected Outlaw to force that was "excessive," did not then conclude that so much of the force as was excessive was justified.

38

C. *The Supposed "Necessary Findings" as to Questions Not Asked*

Allen argues that the jury must have found justification for the total amount of force he used because, he says, "[t]he *only* reasonable interpretation of the jury finding Officer Allen liable for excessive force and at the same time not liable for assault is that Officer Allen reasonably believed *the* force was *necessary to protect* himself, Detective Gordon, or third parties *from the Plaintiff's use or imminent use of force*" (Allen brief on appeal at 23 (emphases added)), and that it was "very wrong" for "the District Court [to] ma[k]e findings of fact in contravention of the *jury's finding that Officer Allen believed* force was necessary *to prevent harm to himself, another officer, or a third party*" (Allen reply brief on appeal at 3 (emphases added)). This argument is factually, doctrinally, and logically flawed.

The factual flaw is, of course, that there were no jury findings as to Outlaw's conduct or Allen's beliefs. The jury was not asked whether Outlaw used force, or threatened force, or appeared to do so. The jury was not asked what Allen saw or believed.

The doctrinal flaw is that what Allen himself "believed" is not a consideration in determining qualified immunity for a federal constitutional violation

but rather is an element only in the state-law concept of justification, *see, e.g.*, Conn. Gen. Stat. § 53a-22(a) (physical force in making an arrest may be justified if based on certain "believed facts"); *cf. Jones v. Marshall*, 528 F.2d 132, 135 (2d Cir. 1975) (in Connecticut, "use of force likely to cause death . . . is privileged only if," *inter alia*, "*the force used was actually* and reasonably *believed* by [the officer] *in good faith* to be necessary to effect the arrest. *See Martyn v. Donlin*, . . . 151 Conn. [402,] 411-12, 198 A.2d [700,] 705-06 [(1964)]" (emphases added)). As discussed above, the federal standard for qualified immunity is what a reasonable officer in Allen's position would have believed, not what Allen himself believed. *See, e.g.*, *Anderson v. Creighton*, 483 U.S. at 641 (the defendant officer's "subjective beliefs about the [circumstances] are irrelevant").

Finally, there are several flaws to Allen's logic, stemming from (1) the instructions given as to different permissible motivations for the use of force, (2) the instructions that permitted the jury to differentiate between amounts of force used, and (3) the different allocations of the burden of proof where, as here, the proper quantum of proof is a preponderance of the evidence. First, in arguing that the jury found justification negating the claim of assault, Allen assumes that the jury "had to

40

have made" the "finding[]" that Allen "believed that he, Detective Gordon, or a third person was in danger." (Allen brief on appeal at 29; *see id*. at 21, 23-24; Allen reply brief on appeal at 6 (calling such a finding "crucial"); *id*. at 3, 4, 5, 7, 8; *see also* Allen brief on appeal at 20 ("The jury . . . had to have credited Officer Allen's testimony that he saw the plaintiff acting aggressively towards Detective Gordon.")). But this assumption ignores the court's instruction that the jury could find a use of force justified if it found either that there was an objectively reasonable concern for safety or that force was objectively reasonably believed necessary to effect an arrest (*see* Instr./Tr. Tr. 24 (force in connection with an arrest is justified "when and to the extent [the officer] reasonably believes such to be *necessary to effect an arrest **or** to defend himself or herself or a third party*" (emphases added)); *see also id*. at 17 ("a police officer may only use such force as is[] objectively reasonable")).

It is undisputed that Outlaw was, at least at some point, standing on the passenger side of the taxi that was double-parked on the left side of Union Place, thereby perhaps constricting the traffic lanes; and Outlaw eventually pleaded guilty to creating a public disturbance. The jury, in finding that Outlaw had not proven his claim against Allen for assault, could well have based that finding on an inference that

41

a certain amount of force was reasonably used merely to effect Outlaw's arrest. There is no necessary inference that the jury found--either also or instead--that Allen was apprehensive for his own safety or anyone else's safety.

Second, the jury was instructed in a way that allowed it to conclude that some portion, but not all, of the force used by Allen may have been justifiable. In response to a question from the jury, the court stated, in a supplemental instruction endorsed by the parties, that the standard for force that is excessive "does not apply to the assault and battery claim." (Trial Transcript January 8, 2016, at 6.) Thus, the jury was informed both that

> *[a]ny* harmful or offensive physical contact is sufficient to support
> a claim of assault and battery unless you find that the use of force
> was justified for the reasons set out in the [main] jury instructions

(*id*. (emphasis added)), and, in the main instructions, that

> *some* degree of physical coercion [is permissible] to effect
> the arrest . . .

(Instr./Tr. Tr. 18 (emphasis added)). Thus, as Allen himself puts it, "the jury finding of no assault is explained in light of the instruction that *some* force can be a defense in a claim of assault." (Allen reply brief on appeal at 9 (emphasis added).)

But while the jury apparently found that the minimal amount of physical

42

contact that would ordinarily constitute an assault did not violate state law here because "some" degree of force could objectively reasonably have been believed necessary to effect Outlaw's arrest, its verdict against Allen on the claim of excessive force in violation of the Connecticut Constitution negates any possible inference that it found the entire amount of force he used to be justified: The jury had been instructed (*see* Instr./Tr. Tr. 24-25) that under Connecticut law a finding of justification would also mean that a plaintiff had not proven excessive force in violation of the Connecticut Constitution. Accordingly, we infer that the jury rejected Outlaw's assault claim because it found that some force was reasonably believed warranted in order to move Outlaw out of the roadway and effect his arrest, but that it also found that the total amount of force used against him was excessive and was not reasonably believed to be necessary.

A third logical flaw inheres in Allen's total disregard of the principle that, as to the facts necessary to establish his entitlement to qualified immunity, he had the burden of proof. In finding against Outlaw on his claim for assault, the jury indisputably concluded that Outlaw had not proven assault in violation of Connecticut law by a preponderance of the evidence. But, as informed by the court's

43

instructions, the jury could have so concluded if it simply viewed the evidence as to Outlaw's claim as being in equipoise (*see* Instr./Tr. Tr. 13 ("If . . . you find the evidence to be in balance or equally probable, . . . then the plaintiff has failed to sustain his burden and you must find for the defendants.")). The jury's finding that Outlaw did not carry his burden of proving assault by a preponderance of the evidence thus did not mean that it found that Allen carried his own burden of establishing the factual predicates on which his claim of entitlement to qualified immunity is based, for example, that Outlaw was hitting Gordon, or attempting to hit Gordon, or acting threateningly or aggressively.

Allen does not suggest that he made any principled attempt to have questions as to facts that could show his entitlement to qualified immunity submitted to the jury. To the contrary, although the transcript of the charge conference indicates that defendants initially wanted to have the jury asked some questions of that nature, the transcript also makes clear, as indicated in Part I.C. above, that defense counsel made a strategic choice to forgo submission of such questions to the jury. The apparent reason was that the district court stated--properly--that as to any such questions the court would have to instruct the jury that the burden of proof as to

44

those matters was on the defendants, and that defense counsel preferred not to have the jury so instructed. Since the court insisted that the jury be instructed properly, defense counsel proposed that no such questions be submitted to the jury and that all of the requisite factual determinations be made by the court. Outlaw, who bore no responsibility for seeing that a sufficient record was created for an affirmative defense, expressly consented. Thus, as defendants wished, questions with regard to "qualified immunity for federal claims" and "qualified immunity for state law claims" were deleted (Conf. Tr. 40); all mentions of the concept of a qualified immunity defense were deleted (*see id*. at 38-40, 42); and an explanation that as to some issues in the case the plaintiff does not have the burden of proof was deleted (*see id*. at 39). As to the entirety of the qualified immunity defense, defense counsel said, "Your Honor has that on your lap, period" (Conf. Tr. 37), and the court accordingly made findings as to facts about which the jury was deliberately not asked. We cannot allow Allen now to put words in the jury's mouth.

While Allen argues that, in asking the court to make factual findings, he did not consent to have the court make findings inconsistent with those made by the

jury, that argument is inconsequential. The jury made none of the factual findings he wishes to impute to it.

Finally, we note that Allen makes no attempt to argue that the evidence at trial was insufficient to support the district court's factual findings. Ironically, he argues that "there was no finding by the jury that it necessarily believed" the various witnesses' "testimony concerning [Outlaw's] version of the facts" (Allen reply brief on appeal at 1 (emphasis omitted)). However, in contrast to the lack of any instructions to the jury on defendants' qualified immunity defense, the jury was instructed that "[i]n order for the *plaintiff* to establish [that he was deprived of a constitutional right], *he must show* . . . by a preponderance of the evidence," *inter alia*, "*that the defendants committed the acts alleged by the plaintiff.*" (Instr./Tr. Tr. 16-17 (emphases added).) The jury so found with respect to Outlaw's constitutional claims.

In sum, we conclude that Allen's arguments that the jury necessarily made factual findings that (a) would entitle him to qualified immunity, and (b) were contrary to the posttrial factual findings made by the court, are meritless. The jury made no findings, express or implicit, as to whether Allen carried his burden of establishing any factual predicate for his defense. The court, having been asked by

the parties to make findings of fact with respect to the qualified immunity defense, had the authority to make credibility assessments and draw such inferences as it believed appropriate. Its findings of fact, described in Part I.C. above, are amply supported by the trial record. We affirm so much of the judgment as awarded Outlaw damages against Allen.

### III. OUTLAW'S APPEAL FROM THE SUMMARY DISMISSAL OF HIS CLAIMS AGAINST THE CITY

In his appeal, Outlaw challenges the district court's grant of summary judgment in favor of the City, dismissing his § 1983 claim and similar state-law claims that the City is liable for the injuries inflicted on him by Allen. His complaint alleged that the City "ha[d] systematically failed to adequately hire, train, supervise, discipline, monitor, counsel, otherwise control and oversee its Police Officers to prevent the kinds of" excessive force inflicted on him. (Complaint ¶ 13.) It alleged that the City and HPD "were on notice of the violent natures and tendencies of its police officer[s]" including Allen, and had "failed to take corrective action to prevent" such conduct. (*Id*. ¶ 14.)

Summary judgment is appropriate only where there are no genuine issues of material fact that preclude judgment for the moving party as a matter of law. See Fed. R. Civ. P. 56(a). We review the grant of a motion for summary judgment *de novo*; we resolve all factual ambiguities in favor of the party against whom summary judgment was sought. *See, e.g., Amnesty America v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) ("*Amnesty America*"); *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996).

A. *Principles Governing Municipal Liability Under § 1983*

It is well established that "under § 1983, local governments are responsible only for 'their *own* illegal acts.' . . . . They are not vicariously liable under § 1983 for their employees' actions." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in *Pembaur*)); *see, e.g., Board of County Commissioners v. Brown*, 520 U.S. 397, 403 (1997) ("We have consistently refused to hold municipalities liable under a theory of *respondeat superior*."); *City of Canton v. Harris*, 489 U.S. 378, 392 (1989); *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 665-83, 691 (1978). Plaintiffs who seek to impose liability on local governments under § 1983 must prove, *inter alia*, that

48

the individuals who violated their federal rights took "'action pursuant to official municipal policy.'" *Connick v. Thompson*, 563 U.S. at 60 (quoting *Monell*, 436 U.S. at 691).

"Official municipal policy includes" not only "the decisions of a government's lawmakers," but also "the acts of its policymaking officials, and *practices so persistent and widespread as to practically have the force of law.* . . . These are 'action[s] for which the municipality is actually responsible.'" *Connick v. Thompson*, 563 U.S. at 61 (quoting *Pembaur*, 475 U.S. at 479-80 (emphasis ours)). Thus, a § 1983 plaintiff need not prove that his injury was caused by an explicitly stated municipal rule or regulation. Further, a municipality may be liable even for its inaction if, in its failure to act, it "'exhibit[ed] deliberate indifference to constitutional deprivations caused by subordinates.'" *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (quoting *Amnesty America*, 361 F.3d at 126), *cert. denied*, 565 U.S. 1259 (2012); *see generally City of Canton*, 489 U.S. at 388-92.

"[D]eliberate indifference is a stringent standard of fault." *Connick v. Thompson*, 563 U.S. at 61 (internal quotation marks omitted).

> [Q]uite apart from the state of mind required to establish the underlying constitutional violation . . . , a plaintiff seeking to

49

establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences. . . . A showing of simple or even heightened negligence will not suffice.

*Board of County Commissioners*, 520 U.S. at 407 (internal quotation marks omitted); *see, e.g.*, *Amnesty America*, 361 F.3d at 128 ("The operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a 'conscious choice' rather than mere negligence." (quoting *City of Canton*, 489 U.S. at 389)).

Thus, to proceed on a deliberate-indifference theory, a plaintiff must first establish "that 'the need for more or better supervision to protect against constitutional violations was obvious.'" *Amnesty America*, 361 F.3d at 127 (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)). This "obvious need may be demonstrated through," for example, "proof of repeated complaints of civil rights violations." *Vann v. City of New York*, 72 F.3d at 1049; *see, e.g.*, *Connick v. Thompson*, 563 U.S. at 61-62 ("[A] city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.'" (quoting *City of Canton*, 489 U.S. at 395 (opinion of O'Connor, *J.*, concurring in part and dissenting in part))); *Fiacco v. City of Rensselaer*,

50

783 F.2d 319, 327 (2d Cir. 1986) (a municipality "should not take a laissez-faire attitude toward the violation by its peace officers of the very rights they are supposed to prevent others from violating"), *cert. denied*, 480 U.S. 922 (1987); *Ricciuti v. New York City Transit Authority*, 941 F.2d 119, 123 (2d Cir. 1991) ("The inference that a [municipal] policy existed may . . . be drawn from circumstantial proof, such as . . . evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges that police officers had used excessive force in violation of the complainants' civil rights.").

Finally, inherent in the principle that "a municipality can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation,'" *City of Canton*, 489 U.S. at 389 (quoting *Monell*, 436 U.S. at 694), is the concept that the plaintiff must show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation," *City of Canton*, 489 U.S. at 385; *see*, *e.g.*, *Cash v. County of Erie*, 654 F.3d at 333 ("to establish municipal liability under § 1983, a plaintiff must prove that 'action pursuant to official municipal policy' caused the alleged constitutional injury" (quoting *Connick v. Thompson*, 563 U.S. at 60)).

B. *The City's Motion for Summary Judgment*

Following discovery, the City moved for summary judgment dismissing the claims against it on the ground that Outlaw could not show that his injuries resulted from a municipal custom or policy. The City submitted an affidavit stating that Gordon and Allen had undergone background checks before being hired by HPD; describing training that Gordon, Allen, and other HPD officers received pursuant to HPD's policies and procedures; and stating that in the years since they began service with HPD both Gordon and Allen had received additional training. (*See* Affidavit of Ursula Wiebusch dated November 23, 2010, ¶¶ 5-9.) The affidavit attached the training records of Gordon and Allen. It also attached pertinent provisions of the City Code of Ordinances that set out the municipal procedure for citizen review of complaints of excessive force or other civil rights violations by HPD officers. The affidavit stated that Gordon and Allen had received supervision as to the proper use of force. (*Id*. ¶ 10.)

In its accompanying memorandum, the City stated that "there [we]re no founded complaints against" Gordon or Allen for use of excessive force. (City's Memorandum of Law in Support of [its] Motion for Summary Judgment ("City's SJ

52

Mem.") at 18.) The City also attached the deposition testimony of Outlaw's police-practices expert, David Stothers (Deposition of David E. Stothers ("Stothers Dep.")). The City noted that Stothers himself thought the City's training practices were adequate. (*See* City's SJ Mem. at 17; Stothers Dep. at 126 (testifying that Stothers was "no[t]" opining "that the City failed to train" its officers, and that he thought "their training was probably adequate").)

Stothers had, however, written a letter opining that the City was lax in supervising its officers (*see* Stothers Letter dated February 5, 2010 ("Stothers Opinion Letter")), in light of its handling of an incident that occurred in November 2004 (described in Part III.C.3. below). The City pointed out that Stothers testified in his deposition that his opinion as to laxity was based only on HPD's investigation of that November 2004 incident. (*See* City's SJ Mem. at 18; Stothers Dep. 128 ("Q. . . . Other than that one particular incident, do you have any support for an opinion that the City failed to take corrective action to prevent use of force on the citizens in general? A. Not based upon things I've read, no.").) The City argued that such a single incident does not suffice to support an inference of a municipal custom or policy. (*See* City's SJ Mem. at 14 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985)).)

53

C. *Outlaw's Submissions in Opposition to Summary Judgment*

In response to the City's motion, Outlaw did not pursue the complaint's theory of deficient training but argued only that the City failed to conduct proper supervision. He principally cited (1) the 1994 annual report of the City's Civilian Police Review Board; (2) lists, produced by the City, of lawsuits and nonlawsuit claims filed against the City and/or HPD officers from 1998 through 2005; (3) a list of use-of-force reports filed by Allen, along with two citizen complaints filed against Allen; (4) documents filed in other litigation against City officials, principally *Cintron v. Vaughn*, No. 3:69-cv-13578 (D. Conn) (or "*Cintron*"); and (5) Stothers's opinion, *inter alia*, that there was "substantial evidence that the HPD has had a custom or practice that amounts to a deliberate indifference to the constitutional rights of persons with whom the agency has come in contact" (Stothers Opinion Letter at 15). Information in these documents included the following.

1. *The Civilian Police Review Board's Annual Report for 1994*

The City's Civilian Police Review Board (the "Review Board" or the "Board") was established in 1992 to review investigations by HPD's Internal Affairs

54

Division ("IAD") of civilian complaints against HPD officers. The Board was required to prepare an annual report detailing, *inter alia*, the type and number of complaints filed against individual officers and the dispositions of the complaints. Outlaw had asked the City to produce the Board's annual reports for 1994 and 2000 to 2005. The City produced only the report for 1994 (the "1994 Report"); the record suggests that annual reports were not prepared for the other years.

According to the 1994 Report, the Review Board's early meetings were met with "mass protest by the police union"; officers "jeered and insulted both the Board and complainants" and threatened some with "bodily harm." (1994 Report 2, 12-13.) The Board also reported difficulties in carrying out its duties, since "[r]epeated requests to the Chief of Police regarding ordinance-mandated data ha[d] been met with marked, delayed responses . . . or no response at all"; and the data that were received were "woefully incomplete." (*Id*. at 4.) The 1994 Report stated that the IAD seemed unable "to complete investigations in a timely manner," as a result of which a "public perception that officers w[ould] not be appropriately disciplined [wa]s reinforced." (*Id*. at 7-8.) And the IAD investigation files often gave the impression "that the complainant rather than the officer . . . [wa]s being investigated by IAD." (*Id*. at 7.)

In its first 17 months, the Board reviewed 26 cases, 18 of which involved complaints of excessive force. Of the 18 excessive-force complaints, the Board sustained 14; IAD had sustained only two.

2. *The Lists of Excessive Force Claims*

Outlaw submitted and emphasized two lists, produced by the City, of civilian complaints against the City and/or HPD officers from 1998 through 2005: One listed 66 lawsuits; the other listed 87 claims on which suit had not been brought but which were submitted to the City's insurer. The City stated that it had identified the claims on these two lists as "possibly" containing allegations of excessive force. (Letter from John P. Shea, Jr. to Diane Polan, Esq., dated May 30, 2007, at 1 ("Shea Ltr.").)

The list of 66 lawsuits showed that one suit ended in a judgment against the City. Of the rest, 40 were settled; 17 were described as having resulted in either a dismissal or a judgment in favor of the City; and eight were still pending when the list was produced. The list of 87 claims submitted to the City's insurer showed that 19 claims had been settled; 26 remained pending; 28 had been denied; seven were

closed or inactive; six bore the notation "STATUTE OF LIMITATIONS"; and one was described simply as "OTHER."

### 3. *HPD Use-of-Force-Report Procedure and Allen's Uses of Force*

During the relevant period, HPD had a procedure requiring officers to file a use-of-non-lethal-force report, known as a "Form 60"--each of which would be assigned a unique number--in any situation in which the officer used "Less Lethal Force," defined as "[a]ny force not reasonably expected to cause death or serious physical injury." HPD General Order 7-27. That regulation required supervisors to forward all Form 60's and related incident reports to an on-duty commander, who was required to review these documents before forwarding them to the Crime Analysis Unit, which in turn was required to forward them to the IAD commander. The HPD Chief of Operations and the Commanders of IAD and Inspections were required to review all use-of-force reporting.

A list produced by the City indicated that from June 2003 through November 2004, Allen filed 11 Form 60's. Except for the incident involving Outlaw himself, the Form 60's themselves were not produced. As to Allen's Form 60 report

with regard to the arrest of Outlaw, the reviewing officer concluded that

> [b]ased on information provided by Det Gordon and Ofc Allen regarding Accused's behavior, Officer Allen's Actions are in compliance with HPD Policy/Procedure and CT General Statutes regarding USE of Force.

(Supervisory Use of Force Review, dated Dec. 22, 2004, of Allen's Form 60, dated Dec. 18, 2004, at 3.) Outlaw did not file a complaint with HPD.

The City produced two citizen complaints that had been filed against Allen, one for an incident that occurred in 2006, principally involving illegal entry into a building, for which he subsequently received remedial training, and the other filed in February 2005 by Clement Nurse with respect to an incident that occurred in November 2004 (the "Nurse Incident"). In the Nurse Incident, Allen, in hitting Nurse on the head, broke his baton. Outlaw cited the depositions of Stothers, a 31-year veteran of the Los Angeles County Sheriff's Department, and Patrick J. Harnett, HPD Chief from 2004 to 2006, who testified that, in their respective several-decades-long careers, they had never heard of an officer striking anyone hard enough to break his baton. (*See* Stothers Dep. 127; Deposition of Patrick J. Harnett at 47.) When HPD investigated Nurse's complaint, three reviewers, including Harnett, sequentially concluded that Allen had used "necessary/reasonable" force against Nurse, in that

58

"the blow to the head [was] inadvertent and [was] caused primarily by the suspect[']s non-compliance." (HPD Internal Investigation Case Review dated 7/13/05, 7/14/05, 8/5/05.) The record does not reveal details of the investigation.

4. *The* Cintron v. Vaughn *Litigation*

Outlaw contended that the City's deliberate indifference to the use by HPD officers of excessive force was proven in other litigation against City officials, particularly *Cintron*. That case had been commenced in 1969 as a class action against the City Manager, the Chief of HPD, and five other officers of HPD--but not against the City itself--alleging a systematic pattern of police misconduct and discrimination toward members of racial minority groups. In 1973, agreement was reached that HPD would, *inter alia*, adopt procedures for internal review of citizen complaints; regulate the use of mace, tear gas, and firearms; and ensure the use of reasonable force during arrests, including by providing training aimed at "eliminat[ing] racial bias and violent reactions to personal conduct." *Cintron v. Vaughn*, No. 3:69-cv-13578, Dkt. No. 107-2, at 2-4, 9 (D. Conn., Consent Decree, June 21, 1973).

59

As described by the *Cintron* court in 2007, the case lay mostly dormant until 1999, when the plaintiffs moved to have the defendants held in contempt for disregard of the obligations to which they had agreed in 1973. *See Cintron v. Vaughn*, No. 3:69-cv-13578, 2007 WL 4240856, at *2 (D. Conn. Nov. 29, 2007). In 2004, the parties reached a new agreement, entered as an Order of the Court ("2004 Order"), creating a Citizen Complaint Procedure designed to improve HPD's investigation of citizen complaints alleging police misconduct. *See id*. In 2005, the plaintiffs moved to have the defendants held in contempt for noncompliance with the 2004 Order. The *Cintron* court found that the defendants were in contempt of certain provisions by, *inter alia*, failing to comply with the requirement that IAD conclude its investigation within 30 days of receiving a complaint--resulting from HPD's assignment of too few investigators to IAD; failing to notify successful complainants, within 15 days, of the results of disciplinary proceedings; and, when notifying unsuccessful complainants that their complaints were not sustained, failing to send specified explanatory materials. *See id*. at *7-*8.

The City's summary judgment motion included documentation showing that in 2010, *Cintron* had been settled, *see Cintron v. Vaughn*, No. 3:69-cv-13578, Dkt.

No. 232 (D. Conn., Order Administratively Closing File, February 23, 2010), and the *Cintron* court had "vacated" the contempt "rulings and findings contained in [its] . . . November 29, 2007 [Order]," *id*. Dkt. No. 230 (D. Conn, Ruling, February 19, 2010).

### 5. *Stothers's Opinion*

Outlaw also pointed to the Stothers Opinion Letter, which focused in part on HPD's failure to implement an early warning system as recommended by a City consultant in 1999 for systematic tracking of officers' uses of force, HPD's failure to have any other procedures in place for critical review of Form 60's, and HPD's failure to timely investigate complaints.  Stothers opined that these failures "sen[t] a strong message to police officers" that it was not concerned about citizen complaints. (Stothers Opinion Letter at 16-17.)  He also opined that Allen himself had a relatively high number of use-of-force incidents--11 in 18 months--in the period leading up to the Outlaw incident.

### D. *The District Court's* Outlaw I *Decision*

The district court, after discussing the principles governing municipal

liability in an action brought under § 1983 (*see* Part III.A. above), concluded that the evidence pointed to by Outlaw was insufficient to support an inference that the City was deliberately indifferent to HPD officers' use of excessive force. At the outset, the court had noted that "[t]he facts advanced by the City are either admitted by plaintiff or, more frequently, met with a statement that plaintiff lacks information concerning their truth." *Outlaw I*, 2015 WL 1538230, at *2.

The court concluded that the 1994 Review Board Annual Report was too remote in time to be probative of HPD custom, policy, or practice at the time of Outlaw's arrest in 2004. *See id*. at *8. While the court noted that the City consultant's 1999 recommendation for an early warning system was based on a study that perceived flaws closer to the time relevant to Outlaw, it also observed that that study

> makes no reference to complaints of unconstitutional conduct or the department's handling of such complaints. Construed most favorably to plaintiff, the Study suggests that there were deficiencies in the citizen complaint process and a perceived lack of discipline. A general policy of lax discipline, assuming it could be proven, does not demonstrate deliberate indifference to serious misconduct rising to the level of unconstitutional acts.

*Id*.

62

The court concluded that Outlaw's reliance on the proceedings and rulings in *Cintron* was misplaced in light of the nature of the claims there asserted. The plaintiffs in that case complained of mistreatment reflecting a systematic pattern of racial discrimination. The court also noted that the backlog of IAD complaints, criticized in *Cintron*, had eventually been eliminated. Although resolutions had not been achieved at an ideal pace, "the fact that there were delays in addressing citizen complaints against the HPD is insufficient to establish that the City had a policy or custom of failing to supervise its officers in the use of force that caused the alleged constitutional violation in this case." *Id*. at *9.

As to Outlaw's contention that the sheer number of excessive-force complaints filed (87) and lawsuits commenced (66) against HPD officers in 1998-2005, as shown on the lists produced by the City, raised an inference that the City exhibited deliberate indifference to the need to supervise the officers, the district court found the record materially lacking in detail:

> Plaintiff has also provided evidence that from 1998 to 2005, there were eighty-eight [*sic*] complaints of excessive force by Hartford police officers filed with the City, and sixty-five [*sic*] lawsuits involving claims of excessive force. *There is no evidence of the facts of these cases, the outcome in each case, or whether and how thoroughly the complaints were investigated by the City*. Nor is there

evidence that these complaints involved the officers in this case. Absent such evidence, *the numbers alone have minimal probative value.*

*Id*. at \*10 (emphases added).

The court also noted that the record contained evidence of very few incidents involving Gordon or Allen and that each incident had been investigated by the City. There was no evidence "that the investigations were superficial or that the City and its police chief 'simply did not care what a thorough investigation would reveal.'" *Id*. (quoting *Fiacco v. City of Rensselaer*, 783 F.2d at 331).

As to Stothers's emphasis on the list of use-of-force reports filed by Allen, the court found that reliance on the mere number of such reports was as flawed as Outlaw's reliance on the mere number of excessive-force claims against the City:

> Stothers states that Officer Allen had eleven use-of-force incidents in the eighteen months leading up to plaintiff's case, "something of which HPD senior management should have been aware." ([Stothers Opinion Letter at 17.]) Again, *no details of these incidents are provided and the statistics alone are meaningless without context. He also opines that the incident in which Officer Al[l]en broke a baton over a suspect's head "should have raised a red-flag to HPD management."* (*Id*.) As noted above, *this incident was investigated and Allen was ultimately exonerated. Stothers admitted that he did not see the entire investigation.* ([Stothers Dep. 128.]) The fact that Stothers disagrees with the outcome of the investigation is insufficient to prove that the City was deliberately indifferent to the use of force therein.

*Outlaw I*, 2015 WL 1538230, at *11 (emphases added).

The court also noted that Stothers's opinion "that the senior management of the HPD has *failed to* meaningfully *review* use-of-force cases" lacked a sound legal foundation because

> Stothers admitted that other than the incident in which Officer Allen broke his baton, Stothers had no support for his opinion that the City failed to take corrective action to prevent use of force on citizens in general.

*Id*. at *10 (emphases added).  Further, Stothers's negative opinion of the way in which HPD reviews excessive force complaints was based only on the method the supervisor had used in Outlaw's case.  The court noted that a

> plaintiff's "personal experience, without more, is insufficient to prove 'deliberate indifference' on the part of the City." *Jenkins v. City of New York*, 478 F.3d 76, 95 (2d Cir. 2007); *Hernandez v. Connecticut Court Support Servs. Div.*, 726 F.Supp.2d 153, 157 (D.Conn.2009) (holding that poor investigation of plaintiff's case was insufficient to prove City of Hartford had custom of inadequate training and supervision of police officers that caused constitutional violations).

*Outlaw I*, 2015 WL 1538230, at *10 (emphasis added).

Accordingly, the court granted the City's motion to dismiss Outlaw's deliberate indifference claim, concluding that

[t]he evidence provided by plaintiff is insufficient to establish that the City had a policy or custom of failing to supervise its police officers in the use of force that actually caused the alleged constitutional violation in his case.

*Id*. at *12.

E. *The Gaps in the Evidence Relied on by Outlaw*

We see no error in the district court's conclusion that Outlaw failed to proffer sufficient evidence to defeat the City's motion for summary judgment. Outlaw's reliance on the proceedings in the *Cintron* litigation is misplaced because the settlement agreements, orders, and findings of contempt in that case must be considered in light of the charges at issue there. The focus of that litigation was not a pervasive use of excessive force; rather, the complaint alleged a systematic pattern of misconduct and discrimination toward members of racial minorities. The *Cintron* proceedings had minimal value to prove the proposition that the City was generally indifferent to HPD officers' use of excessive force.

Nor did the district court err in concluding that there was insufficient probative evidence in the record to support the proposition that the December 2004 injuries to Outlaw were proximately caused by a municipal disregard of the need for

better supervision of Allen himself. In response to a discovery request by Outlaw, the City identified only two instances in which excessive-force complaints had been filed against Allen. One, which centered on Allen's improper entry into a building, was filed in 2006. Whatever HPD's response to that incident (which resulted in a requirement of additional search-and-seizure training for Allen)--and whether or not there was an alleged use of excessive force--HPD's handling of it could not have been a proximate cause of the injuries that Outlaw had suffered more than a year earlier.

The other complaint against Allen concerned the Nurse Incident, and although Allen's breaking his baton on Nurse's head occurred in the month before the December 2004 incident with Outlaw, Nurse did not file a complaint with HPD until February 2005. While Stothers suggested that the Nurse Incident "should have raised a red-flag to HPD management," he also opined that "HPD senior management was apparently unaware of" the Nurse Incident "at the time." (Stothers Opinion Letter at 17.) The Nurse Incident was eventually investigated by HPD, and Outlaw's reliance on that event is flawed due to the absence of any evidence that HPD management had deliberately ignored it prior to December 17, 2004. As discussed in Part III.A. above, a § 1983 claim for deliberate indifference by a municipality is not

sustainable where its failure is attributable to mere negligence rather than to conscious choice.

The lists of the lawsuits filed and the claims sent to the City's insurer might have led to evidence from which an inference of deliberate indifference to excessive force could properly be drawn, but as noted by the district court, there was no evidence as to the facts underlying those claims or how thoroughly they were investigated by the City. The simple fact that claims were made and that some of them were settled would not permit an inference that the City was deliberately indifferent in the supervision of HPD officers with respect to the use of excessive force. Indeed, it is not even clear that all of the entries on the lists involved claims of excessive force, as the City stated that they were lists of claims that "the City ha[d] previously identified as *possibly* containing allegations of excessive force" (Shea Ltr. at 1 (emphasis added)). And it noted that "many of" the officers whose names appeared on either list had not necessarily been accused of using "excessive force" (*id*. at 1-2); in the lawsuit list, the City had provided the names of all officers whose names were mentioned anywhere "in the litigation file as having some involvement in the matter," which could have been "their position in the chain of command or *their involvement in any pertinent investigations*" (*id*. at 1 (emphasis added)). That description

68

itself suggests that there had been investigations; but the record provides no information as to the scope of any investigations or any outcomes such as disciplinary actions or remedial training.

The list of the 11 Form 60's filed by Allen indicating his uses of nonlethal force to effect arrests from June 2003 through November 2004 was similarly lacking in sufficient detail. From this list, only the Form 60 with regard to Outlaw is in the record. The record does not show any specifics as to the circumstances of, or the amounts of force used in, the other incidents. And although Stothers opined that 11 was a relatively high number of use-of-force reports for an 18-month period, the record does not indicate his basis for that comparative assessment.

As indicated in Part III.A. above, a municipal policy of deliberate indifference to the use of excessive force by police officers may be shown by evidence that the municipality had notice of complaints of the use of such force but repeatedly failed to make any meaningful investigation into such charges, *see, e.g., Ricciuti v. New York City Transit Authority*, 941 F.2d at 123; *Fiacco v. City of Rensselaer*, 783 F.2d at 326. Thus, *Monell* liability, by its nature, will often turn on evidence concerning victims other than the plaintiffs and alleged misfeasors other than the individual defendants. In addition, a given officer's disciplinary history may be probative of whether it was

foreseeable to the municipality that the officer would engage in misconduct yet again.

*See, e.g., Vann v. City of New York*, 72 F.3d at 1050-51. To be sure, the right to probative evidence in *Monell* and other actions is "not absolute" and will be "frequently qualified in the interest of protecting legitimate interests." *SEC v. Rajaratnam*, 622 F.3d 159, 181, 182 (2d Cir. 2010). For example, "[a] district court must . . . limit 'the frequency or extent of discovery' if it determines that . . . 'the burden or expense of the proposed discovery outweighs its likely benefit,'" *id*. at 181 (quoting Fed. R. Civ. P. 26(b)(2)(C) and Fed. R. Civ. P. 26(b)(1), "[a]nd a district court may issue protective orders 'for good cause . . . to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense,'" *id*. (quoting Fed. R. Civ. P. 26(c)(1)). But objections based on facile claims of undue burden, overbreadth, and lack of relevancy do not take account of these principles.

The record before us does not show that Outlaw made requests for information as to the City's "investigations" of excessive-force complaints; but it does show that he had sought the foundational information as to the existence of such complaints. His effort to obtain that basic preliminary information was largely resisted by the City. For example, during the discovery period, Outlaw had requested production by the City of, *inter alia*, all excessive-force complaints against HPD

70

officers from 1994 to 2004, and all of Allen's HPD disciplinary records (*see* Outlaw's document request to the City, Nos. 4, 6). Aside from identifying one complaint against Gordon and two against Allen, the City refused production of such complaints, objecting that the request was "overly broad, vague and unduly burdensome" and that as the request covered "a period of nine [*sic*] (9) [*sic*] years prior to the date of the [Outlaw] incident," it was "unlikely to lead to the discovery of admissible evidence" (City's Objection to Outlaw's document request No. 4). Moreover, in response to Outlaw's far more limited request for disciplinary records of just the officers other than Gordon and Allen who were "*involved in the incident/arrest of the Plaintiff referenced in the Complaint,*" the City objected that the request was "overly broad, vague, and unduly burdensome" on the specious ground that the "interrogatory *seeks information from the entire Harford [sic] Police Department based on the term 'involved'*" (City's objection to Outlaw's document request No. 3 (emphases added)). And the City declined to disclose Allen's disciplinary records on the ground, *inter alia*, that the request "constitutes an invasion of [Allen's] personal privacy." (City's Objection to Outlaw's document request No. 6.) Allen himself, in response to an interrogatory asking whether he had "ever been accused of violating anyone's civil rights" (Outlaw's Interrogatory No. 1 to Allen), similarly objected to the

71

question as an invasion of his privacy.

The City on appeal criticizes Outlaw for failing to cite any "evidence of any citizen complaint that was filed and was not investigated" (City brief on appeal at 9). Yet the City had objected to the interrogatories that sought to identify all filed complaints--even those limited to the officers who, in addition to Gordon and Allen, had been involved in the arrest of Outlaw.

However, the record does not show any determined effort by Outlaw to obtain the potentially probative information that defendants declined to provide. Following the discovery responses described above, Outlaw moved for an order compelling the City to produce the information he had requested. But he then withdrew his motion. And the record does not reveal any further motion to compel. Some of the City's objections to some Outlaw requests may have been appropriate. But it was incumbent on Outlaw, who of course had the burden of proving the claims he asserted, to utilize procedures provided by the Federal Rules of Civil Procedure to compel responses to his requests that sought necessary information and that were appropriate. Having withdrawn his motion to compel, Outlaw's reliance on the lists of lawsuits and claims filed against the City--one ending in a judgment against the City, dozens being settled, and some perhaps not even involving complaints of

72

excessive force--is flawed by the lack of detailed information he chose not to pursue.

Finally, we see no error in the district court's conclusion that the circumstances described in the Civilian Police Review Board's Annual Report for 1994 described events too remote in time to be probative of HPD's supervision policies in 2004--especially given that the evidence of more recent events was so lacking in material detail.

# CONCLUSION

We have considered all of the arguments by the parties in support of their respective appeals and, for the reasons stated above, have found them to be without merit. The judgment of the district court is affirmed.